GRUPO GIGANTE S.A. de
C.V.; et al., Plaintiffs,

v.

DALLO & CO., INC. aka Dallo Co.,
Inc. dba Dallo Enterprises; et
al., Defendants,

And Related Counterclaims.

No. CV 99–07806 DDP (MANX).

United States District Court,
C.D. California.

Oct. 27, 2000.

Matthew A. Hodel, Sean A. O'Brien, Paul Hastings Janofsky & Walker, Costa Mesa, CA, for Plaintiffs.

James P. Delphey, Laura H. Roppe, Seltzer Caplan McMahon & Vitec, San Diego, CA, Randy M. McElvain, John F. Morning, Weston & McElvain, Los Angeles, CA, Janice P. Brown, San Diego, CA, John F. Morning, Weston & McElvain, Los Angeles, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PREGERSON, District Judge.

This matter comes before the Court on the parties' cross-motions for summary judgment or partial summary judgment. After reviewing and considering the materials submitted by the parties and hearing oral argument, the Court adopts the following order.

### BACKGROUND

This action stems from a trademark dispute between two parties who both use the name "Gigante" on their retail grocery stores. The plaintiffs began operating a chain of retail grocery stores in Mexico under the name Gigante in 1962. They opened their first stores in Baja California in 1987, and by August 1991, they had six Gigante stores in Baja California, including two in Tijuana. In August 1991, the defendants began operating a retail grocery store named Gigante in San Diego, and they opened a second Gigante store in San Diego in late 1996 or early 1997.

The two Gigante stores appeared to coexist peacefully on opposite sides of the border for almost eight years. In June 1998, however, a representative of the plaintiffs met with a representative of the defendants to discuss the fact that the parties were using the same name on their grocery stores. During the meeting, the plaintiffs' representative either accused the defendants of selecting the name Gigante in anticipation that the plaintiffs would someday buy them out, or stated that the defendants' use of the name was unlawful. Insulted by this accusation, the defendants' representative terminated the meeting. The parties had no further contact for about a year.

In May 1999, the plaintiffs opened their first Gigante store in the United States, in Pico Rivera, California. Shortly thereafter, on July 20, the defendants' counsel wrote a letter to the plaintiffs, demanding that they stop using the Gigante name on their California grocery stores. The plaintiffs refused, and filed the present lawsuit on July 29, 1999. Since filing this lawsuit, the plaintiffs have opened two more stores in the Los Angeles area.

In their complaint, the plaintiffs allege causes of action for: (1) trademark infringement in violation Section 43(a) of the Lanham Act; (2) false designation of origin, misrepresentation and unfair competition in violation of Section 43(a) of the Lanham Act; (3) trademark dilution in violation of the Federal Trademark Dilution Act; (4) common law unfair competition; (5) state law unfair competition; (6) state law trademark dilution; and (7) common law trade name infringement.[1] The

1. The plaintiffs also alleged causes of action for: (1) use of a well-known mark in violation

plaintiffs also request a declaratory judgment that their right to use the Gigante mark is superior to the defendants' right.

In addition to answering the plaintiffs' complaint, the defendants filed a counterclaim alleging: (1) trademark infringement in violation of Section 43(a) of the Lanham Act; (2) false designation of origin, misrepresentation and unfair competition in violation of Section 43(a) of the Lanham Act; (3) common law unfair competition; (4) state law infringement and unfair competition; (5) trademark dilution under state law; and (6) cancellation of the plaintiffs' state registration. The defendants also seek a declaratory judgment that they have the legal right to use the Gigante mark.

The parties have now filed cross-motions for summary judgment or partial summary judgment. The plaintiffs have moved for summary judgment on six of their eight claims: trademark infringement and unfair competition under federal law, common law unfair competition, state law unfair competition, common law trade name infringement, and request for declaratory relief. The plaintiffs have not moved for summary judgment on their federal and state law dilution claims. In their motion, the plaintiffs do not seek damages; rather they ask the Court to permanently enjoin the defendants from using the Gigante mark on their San Diego stores and to declare that the plaintiffs are entitled to use the Gigante mark in the United States.

The defendants have moved for summary judgment on the plaintiffs' entire complaint, including the federal and state dilution claims. In addition, the defendants have moved for partial summary judgment on their counterclaim for cancellation of the plaintiffs' state registration.

of Section 6 *bis* of the Paris Convention; and (2) unfair competition in violation of Section 10 *bis* of the Paris Convention. The Court dismissed these two causes of action on June 12, 2000.

## UNDISPUTED FACTS

In support of their respective motions, both parties have submitted a separate statement of undisputed facts ("SUF"). Although the parties have disputed many of each other's purportedly undisputed facts, the Court finds that the following facts are undisputed.

The plaintiffs opened their first Gigante grocery store in 1962 in Mexico City. (Ps SUF No. 1.) They registered the Gigante trade name in Mexico in 1963, and have maintained and renewed that registration through the present. (Ps SUF No. 2.) In 1987, the plaintiffs opened their first stores in the Baja California region of Mexico. (Ds SUF No. 26.) As of August 1991, the plaintiffs operated six Gigante stores in Baja California, including two in Tijuana.[2] (Ds SUF No. 27; Ps SUF No. 32.) In addition to the six Baja California stores, the plaintiffs operated approximately 91 other Gigante stores throughout Mexico. (Ps SUF No. 32.)

The defendants currently operate two Gigante stores in San Diego, California. Their first Gigante store opened on August 15, 1991. (Ps SUF No. 11.) The plaintiffs purchased this store in June 1991. (Ds SUF No. 1.) Although the store was not yet open for business, the seller had already named the store Gigante Market. (Ds SUF No. 2.) The defendants' second Gigante store began operating under that name sometime around October of 1996. (Ds SUF No. 13.) When the defendants purchased the second store in June of 1996, it was named Food Giant. (Ds SUF 11.) Within approximately four months of purchasing the store, however, the defendants changed the name to Gigante Market. (Ds SUF 13.)

On May 5, 1999, the plaintiffs opened their first Gigante store in the United States, in Pico Rivera, California. (Ps

**2.** The plaintiffs also had two stores in Ensenada and two in Mexicali.

SUF No. 25.) On December 10, 1999, they opened a second U.S. store in Arleta, California, and on June 2, 2000, they opened a third U.S. store in Covina, California. (Ps SUF No. 27.) The plaintiffs have plans to open other stores in Los Angeles and San Diego counties in the next several years. (Ps SUF No. 83.)

Although not critical to the analysis of this case, the Court also notes that the plaintiffs currently operate approximately 200 Gigante stores. In addition to the three California stores, they operate 29 stores in Baja California, including 18 stores in Tijuana. The remaining stores are located in Mexico. (Ps SUF Nos. 4, 7, 25, 27, and 46.) In 1999, the plaintiffs were listed in *Mexico–Business* magazine as the 15th largest company in Mexico, with total sales exceeding $2.4 billion. (Ps SUF No. 5.) The Court also notes that, although the defendants' operations are considerably smaller than the plaintiffs', the defendants' Gigante stores had sales in excess of $3.6 million in 1998. (Ps Resp. to Ds SUF No. 20.)

It is thus undisputed that the plaintiffs have been using the Gigante mark on their Mexican stores since 1962, and that they have had stores in Tijuana since 1987. It is also undisputed that the defendants first used the Gigante mark on their store in San Diego in August 1991, and that they were the first to actually use the Gigante mark on a store located in California. Finally, it is undisputed that the plaintiffs have recently begun expanding into California, that they currently use the Gigante mark on three stores in Los Angeles County, and that they have plans to expand into San Diego.

In addition to the undisputed facts recited above, the parties have presented the Court with numerous facts that are hotly disputed. Most of the disputed facts have to do with how well-known the plaintiffs' Gigante mark was in 1991, when the defendants opened their first Gigante store in San Diego. The parties also dispute the conclusions to be drawn from various surveys performed by marketing companies and retained experts. Where these disputed facts are relevant, the Court discusses them below in its analysis of this case. Although it is perhaps an obvious point, the Court also notes that where the facts are both truly disputed and material to a particular issue, summary judgment on that issue cannot be granted.[3]

## DISCUSSION

### A. Legal Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining a motion for summary judg-

---

**3.** The plaintiffs have objected to some of the evidence submitted by the defendants, including several exhibits that were attached to the McElvain Declaration. The Court did not rely on Exhibits B, C, or N in ruling on this motion. The Court did, however, rely on the report prepared by the plaintiffs' expert, Dr. Ivan Ross, which was attached to the McElvain Declaration as Exhibit L. The plaintiffs objected to the admissibility of this report even though they submitted a declaration from Dr. Ross and a copy of his report in support of their own motion for summary judgment. The defendants have also objected to the admissibility of a report prepared by

the defendants' expert, Dr. Gary Frazier on the grounds that it lacks foundation and it is inadmissible hearsay. The Court overrules this objection. Dr. Frazier prepared the report, the report is attached to his declaration, and in his declaration he authenticates the report. The Court does not understand the plaintiffs' hearsay objection. The plaintiffs mention the admissibility of surveys, but Dr. Frazier's report is not a survey. And although Dr. Frazier based some of his opinions on marketing surveys performed by others, the Court finds that this is the type of information that is commonly relied on by marketing experts.

ment, all reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *Id.* at 242, 106 S.Ct. 2505.

## B. Analysis

### 1. The Plaintiffs' Trademark Infringement and Unfair Competition Claims

 The plaintiffs have moved for partial summary judgment on their claims for trademark infringement and unfair competition under the Lanham Act, common law unfair competition, state law unfair competition, common law trade name infringement, and their request for declaratory relief. In order to prevail on each of these claims, the plaintiffs must show that: (1) they have a valid, protectable trademark in the name Gigante; and (2) the defendants' use of the Gigante mark creates a likelihood of confusion. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 (9th Cir.1999); *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir.1994) (noting claims for state law infringement and unfair competition are substantially convergent with claims under Lanham Act).

### a. Do the plaintiffs have a protectable mark?

The first question the Court must address is whether the plaintiffs have a valid, protectable interest in the Gigante mark. If not, their entire motion for partial summary judgment fails.

### i. Has either party established the right to use the Gigante mark through registration or filing?

 Both parties argue that they have established the exclusive right to use the Gigante mark either through state registration or the filing of a fictitious business name statement, or both. The Court rejects these arguments. Both parties have registered the Gigante mark with the State of California: the plaintiffs on June

12, 1998, (Ps SUF No. 10), and the defendants on July 22, 1998 (Ps SUF No. 23).[4] Although state registration constitutes prima facie evidence of ownership of the mark, *see* Cal. Bus. & Prof.Code § 14241, this evidence can be rebutted by showing that someone else actually used the mark first. *Brookfield,* 174 F.3d at 1047. Thus, even though the plaintiffs were the first to register the Gigante mark, the defendants can still establish that their rights are superior to the plaintiffs' by showing that they were the first to actually use the Gigante mark. Similarly, the fact that the defendants' filed a fictitious business name statement for the Gigante name in July 1992, (*see* Ds SUF No. 5), does not dispose of the issue of whose right to use the Gigante mark is superior; although the filing of a fictitious business name statement creates a presumption that the filer has the exclusive right to use the name, this presumption can be rebutted by showing that another was the first to use the name. *See* Cal. Bus. & Prof.Code § 14411. Both parties have presented evidence that their use of the Gigante mark pre-dated both the state registration and the filing of the fictitious business statement. The Court thus finds that neither the state registration nor the filing of a fictitious business name statement is dispositive. The primary issue in this case is who was the first to use the Gigante mark.

### ii. Which party has established the superior right to use the Gigante mark?

 "It is axiomatic in trademark law that the standard test of ownership is priority of use." *Sengoku Works Ltd. v. RMC Int'l, Ltd.,* 96 F.3d 1217, 1219 (9th Cir.1996). To show priority of use, "it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Id.* "The first

4. Neither party has registered the Gigante mark with the United States Patent and Trademark Office.

to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion." *Brookfield,* 174 F.3d at 1047.

In this case, it is undisputed that the plaintiffs were the first to use the Gigante name on their grocery stores. This fact would seem to end the analysis were it not for another purportedly basic principle of trademark law, which is that "[p]riority of trademark rights in the United States depends solely upon priority of use in the United States, not on priority of use anywhere in the world." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (hereafter "*McCarthy* "), § 29:2 at 29–6; *see also Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha,* 754 F.2d 591, 599 (5th Cir. 1985) (noting that foreign use of trademark is ineffectual to create trademark rights in U.S.); *Scholastic, Inc. v. Macmillan, Inc.,* 650 F.Supp. 866, 873 fn. 6 (S.D.N.Y.1987) (noting in dicta that extensive use of trademark in Canada and Australia is not relevant to establishing trademark rights in U.S.). This principle is usually referred to as the territoriality principle. *See, e.g., Person's Co., Ltd. v. Christman,* 900 F.2d 1565, 1568–69 (Fed. Cir.1990). According to *McCarthy:*

> Prior use of a trademark in a foreign country does not entitle its owner to claim exclusive trademark rights in the United States as against one who used a

similar trademark in the U.S. prior to entry of the foreigner into the domestic American market.

*McCarthy,* § 29:3 at 29–8.

It is undisputed that, although the plaintiffs were the first to use the Gigante name on their grocery stores, the defendants were the first to use the name Gigante on grocery stores in the United States in general, and in Southern California in particular. (Ds SUF No. 31.)[5] Thus, the defendants argue that the plaintiffs' prior use of the Gigante name on their stores in Mexico does not grant them any rights to use the mark in the United States, and that the defendants are actually the senior users of the Gigante name for purposes of this lawsuit.

As both parties note, however, there is an exception to the territoriality principle if the foreign mark is well-known or famous in the United States. "If a mark used only on products or services sold abroad is so famous that its reputation is known in the United States, then that mark should be legally recognized in the United States." *McCarthy,* § 29:4 at 29–9. In other words, if the plaintiffs' Gigante mark was well-known in the United States at the time the defendants began using the mark, then the plaintiffs' mark will be protected in the United States as against the defendants' mark. Indeed, both parties appear to concede that, at least as far as federal law is concerned, the plaintiffs must establish that their mark

---

**5.** Ds SUF No 31 states: "The opening of [the plaintiffs'] Pico Rivera store in May 1999 was the first time any of the ... plaintiffs actually provided grocery or supermarket services under the Gigante name within the United States." The plaintiffs have disputed this fact, and argue that it is false. As evidence of its falsity, the plaintiffs note the following: (1) since the late 1980s, they purchased products manufactured in the U.S. and imported those products into Mexico; (2) one month prior to the defendants' opening their first "Gigante" store in San Diego, the plaintiffs had a public offering of stock in Mexico and a private placement offering of stock in the U.S.; and (3) in 1996 the plaintiffs began selling private label products containing the "Gigante" mark

in the U.S. (*See* Ps Response to Ds SUF No. 31.) Even assuming that the plaintiffs' three contentions are true, the Court does not find that this diminishes the truth of the defendants' statement that the plaintiffs first began providing grocery services under the Gigante name in the U.S. in 1999. Purchasing products from the United States and having a private placement stock offering in the United States does not constitute selling groceries in the United States. And although it may be true that the plaintiffs sold private label products containing the Gigante mark in the United States in 1996, this is still five years after the defendants first began selling groceries under the Gigante name.

was well-known or famous in order to prevail on their motion for summary judgment. (*See* Ps MPA pp. 13–19 (arguing that plaintiffs have established priority of use under federal "well-known" mark doctrine); Ds MPA pp. 13–22 (arguing famous marks exception does not apply).)

■ It is perhaps unfortunate that this exception to the territoriality principle is usually referred to as the famous marks doctrine. In both lay terms and in terms of the Federal Trademark Dilution Act, the word "famous" connotes a high degree of renown. A survey of the cases, however, reveals that not much fame at all need be shown, and that the famous marks doctrine in general is not very strong. Indeed, as *McCarthy* notes, "[t]he famous mark rule could be viewed as not constituting an exception to the general rule at all, since it could be said that the foreign service business had already established priority in the United States through advertising and reputation prior to defendant's opening." *McCarthy* at § 29:4 at 29–9 to 29–10. Immediately after making this statement, *McCarthy* cites to another section of the treatise that discusses the *Tea Rose–Rectanus* doctrine. Under the *Tea Rose–Rectanus* doctrine, priority of use of a mark in one area of the United States does not give rights to prevent its use by a good faith and innocent user in a remote geographic area. *McCarthy* § 26:2 at 26–4 to 26–8. The basis for the doctrine grows out of the axiom that trademark rights are governed by priority of use. If the senior user has not actually used its mark in the junior user's territory, the senior user should not be able to enjoin the junior user from using the mark. The *Tea Rose–Rectanus* doctrine is thus a defense to an infringement suit that can be raised by a junior user.

The defense is not available, however, where a senior user located in one area of the United States has achieved an appreciable level of fame in the junior user's trading area. As explained by *McCarthy*, "[t]he *Tea Rose–Rectanus* defense applies only where the senior user's mark is *not*

*known* to customers in a remote area at the critical date of the junior user's first good-faith adoption and use." *McCarthy* § 26:16 at 26–24. This limit on the defense recognizes the realities of modern society and business by acknowledging the fact that a trademark can be carried to areas far from the actual point of sale due to advertising and the ambulatory nature of consumers. As noted by one court, "[t]he traditional notions of limited market area pervading the earlier cases dealing with product trademarks are not persuasive in this day of modern communication and travel." *Travelodge Corp. v. Siragusa*, 228 F.Supp. 238, 243 (N.D.Ala.1964).

■ McCarthy states that the *Tea Rose–Rectanus* defense does not apply to trademarks used outside the United States. *McCarthy* § 26:5 at 26–11 to 26–12. However, when McCarthy discusses the famous marks doctrine, he cites to the section of his treatise that discusses the limits on the *Tea Rose–Rectanus* defense. Moreover, because the cases from which the famous marks doctrine supposedly arises are not very helpful in defining a famous mark, and the Court finds that the rationale for limiting the *Tea Rose–Rectanus* doctrine is helpful in delineating the famous mark doctrine. The Court finds that, in order to establish that a foreign mark is sufficiently famous to qualify for protection in the United States, the foreign user need only show that the mark is sufficiently known to potential customers in the area of the United States in which it seeks protection. Although this interpretation might not comport perfectly with the lay meaning of the word "famous", the Court notes that it finds support in the case law. In *Vaudable v. Montmartre*, for example, the case most often cited in support of the famous marks doctrine, the court enjoined the defendant from using the name "Maxim's" on its New York City restaurant because the evidence showed that the plaintiff's "Maxim's" restaurant, which was located in Paris, had attained a "unique and eminent position as a restau-

rant of international fame and prestige," and, perhaps more importantly, was "well known ... to the class of people residing in the cosmopolitan city of New York who dine out." 20 Misc.2d 757, 758, 193 N.Y.S.2d 332 (N.Y.Sup.1959); *see also Resorts Int'l, Inc. v. Greate Bay Hotel & Casino, Inc.,* 1991 WL 352487 (D.N.J.1991) (holding trade name "Paradise Island" used to designate casino and hotel complex in Caribbean was entitled to protection from infringement in the United States; evidence showed that 16% of Atlantic City casino-goers named Paradise Island as a casino in the Caribbean (unaided awareness) and 64% had heard of Paradise Island (aided awareness)); *Koffler Stores, Ltd. v. Shoppers Drug Mart, Inc.,* 434 F.Supp. 697, 704 (E.D.Mich.1976) (enjoining domestic defendant from using foreign plaintiff's trademark, even though defendant had first used mark on stores in United States; plaintiff had advertised and developed good will in United States and court held "[w]here advertising and good will extend beyond the immediate selling market, this reputation will be protected").

■ The Court thus frames the relevant inquiry as follows: as of August 1991, at the time the defendants first used the Gigante name on their grocery store in San Diego, was the plaintiffs' Gigante mark sufficiently known to San Diego consumers to warrant protection from infringement? In determining whether the plaintiffs' mark was sufficiently known to warrant protection, the Court will consider the same factors that are considered in determining whether a descriptive mark has acquired secondary meaning. Secondary meaning refers to a mark's ability to identify particular goods and services in the minds of consumers. *See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). In order to be protectable, all marks must be capable of identifying particular goods and services and distinguishing them from the goods and services of others. *Id.; see also McCarthy, supra,* § 15:1 at 15–7 (noting that basic element in trademark infringement case is that

public recognizes plaintiff's mark as identifying his goods and services). Marks that are arbitrary, fanciful, or suggestive are regarded as immediately capable of identifying particular goods and services, *see id.,* and are, in effect, "irrebuttably presumed to have achieved customer recognition and association immediately upon adoption and use." *McCarthy, supra,* § 15:1 at 15–5. Marks that are merely descriptive, however, are not protectable until they have achieved secondary meaning. *Two Pesos,* 112 S.Ct. at 2757. Because secondary meaning is, in effect, synonymous with consumer recognition and association, *see, e.g., Carter–Wallace, Inc., v. Procter & Gamble Co.,* 434 F.2d 794, 802 (9th Cir. 1970), the Court finds that the factors that are relevant in determining whether a descriptive mark has achieved secondary meaning are also relevant in determining whether a foreign mark has achieved a sufficient degree of renown in the United States to warrant protection from infringement.

■ The relevant factors include: survey evidence; direct consumer testimony; exclusivity, manner and length of use of the mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant. *See, e.g., Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.,* 198 F.3d 1143, 1151 (9th Cir.1999). Although all of these factors could be relevant in any given case, survey evidence will often provide the most persuasive evidence of consumer recognition and association. *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1358 (9th Cir.1985). In the context of a foreign mark, the Court also considers where in the world the mark was originally used. For example, where the mark was first used in Paris or Tokyo, it would probably need to be quite famous in the lay meaning of the word in order to be known to consumers in the United States. Where a mark was first used in a country that borders the United States,

however, it would need to be much less famous in order to be known to United States consumers who live near that border.

In framing the inquiry in this way, the Court notes that this is how the case would be analyzed if the plaintiffs and the defendants were both operating stores under the same descriptive name in Southern California. *See, e.g., McCarthy*, § 16:34 at 26–43 to 26–44 (noting that where plaintiff and defendant both use descriptive mark, "the issue of priority and ownership is not which party first used the mark, but which party first achieved secondary meaning in the mark"); *Investacorp, Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1524 (11th Cir.1991) (holding plaintiff has no protectable interest in descriptive mark unless it attained secondary meaning before defendant started using similar mark). San Diego is less than 20 miles from Tijuana. The Court finds no rational reason why the outcome in this case should be different if the plaintiffs operated their Gigante grocery stores 20 miles to the north of the defendants' stores, rather than 20 miles to the south.

■■■ Having framed the relevant inquiry, the Court now turns to the evidence of how well known the plaintiffs' Gigante mark is to the relevant class of consumers.

The plaintiffs and the defendants both market their stores to Mexican–Americans. The plaintiffs have presented evidence to show that the Gigante mark is currently well-known among Mexican–Americans in Southern California, and that Mexican–Americans make up a significant portion of their customers in their Baja California stores. (*See, e.g.,* Ps SUF Nos. 38–46.) Much of this evidence, however, post-dates August 1991. In order to show that they have a protectable interest in the Gigante name for purposes of this case, the plaintiffs must show that their name was known before the defendants began operating their first Gigante store. The critical question is thus whether, as of August 1991, the Gigante name was sufficiently well-known among the relevant

class of consumers (i.e., Mexican–Americans in San Diego) to warrant protection. *See, e.g., Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 877 (9th Cir.1999) (holding that "famousness" under trademark dilution act can be shown by fame in a localized trading area or specialized market segment); *Vaudable*, 20 Misc.2d at 758–59, 193 N.Y.S.2d 332 (enjoining use of name "Maxim" on restaurant in New York City based on prior use of name "Maxim" on restaurant in Paris that was well known in the United States "to the class of people residing in the cosmopolitan city of New York who dine out").

As evidence of its renown in the San Diego area as of August 1991, the plaintiffs have offered the following:

(1) As of August 1991, the plaintiffs operated 6 stores in Baja California (2 in Tijuana, 2 in Mexicali, and 2 in Ensenada), and a total of 97 stores throughout Mexico. (Ps SUF Nos. 30, 32.)

(2) In July 1991, the plaintiffs had a private placement stock offering in the United States. (Ps SUF No. 29.)

(3) According to a survey conducted by the plaintiffs' expert, Dr. Ivan Ross, since at least 1990 (i.e., one year prior to the defendants' use of the Gigante mark), a statistically significant percentage of the Mexican–American community living in San Diego County recognized the Gigante mark. (*See* Ross Decl., Ex. A.)

The Court finds that the first two facts are not particularly probative. The size of the plaintiffs' overall Mexican operations, and the fact that they operated several stores very near to the United States border, could certainly have led to some level of renown in San Diego. Standing alone, however, this fact is insufficient to establish that Mexican–Americans in San Diego knew the Gigante name. The private placement stock offering is also not particularly probative. No information has been provided regarding how the private place-

ment was marketed, to whom it was marketed, who purchased the stock, where the purchasers resided, or whether they were Mexican–Americans living in San Diego County.

The most persuasive evidence that the plaintiffs have provided is the survey conducted in May and June of 2000 by Dr. Ross. *See Levi Strauss,* 778 F.2d at 1358 (noting survey evidence can provide the most persuasive evidence of secondary meaning). Because the defendants' dispute the conclusions to be drawn from the survey, the Court will discuss the survey in some detail.

The survey universe consisted of 78 randomly selected individuals who lived in San Diego County, were over the age of 18, were Spanish-speaking, and had recently purchased Mexican-style food at a supermarket or other food store. (*See* Ross Decl. ¶ 13 and Ex. A, p. 1.) The survey was designed to test both unaided and aided awareness of the Gigante name, and, more importantly, to test when the Gigante name first became known among Mexican–Americans in San Diego County. Twenty-four of the respondents: (1) had recently shopped at a Gigante store in Mexico; (2) believed that the Gigante name was affiliated with an entity that had at least one store located in Mexico; or (3) were aware of a Gigante supermarket located in Mexico. (Ross Decl., Ex. A, p. 10.) After adjusting for "noise" (i.e., respondents who identified as Mexican a supermarket that was not actually located in Mexico), Dr. Ross concluded that 28% of the respondents were aware of the plaintiffs' Gigante stores. (*Id.*)

The 24 respondents who were aware of' the plaintiffs' Gigante stores were then asked the following question: "[A]s best you can recall, about when was it that you

first heard of the Mexican store named Gigante?" (*Id.,* p. 69.) Thirteen percent responded that they first heard of the Mexican Gigante before 1970; 17% had heard of it between 1970 and 1980; 42% had heard of it between 1980 and 1990; 25% had heard of it since 1990; and 4% did not know/did not recall. (*Id.,* p. 24.) Thus, of the respondents who were aware of the plaintiffs' Gigante mark, 72% had heard of the mark prior to the defendants' entry into the San Diego market. This means that 22% of all of the survey respondents had heard of the Mexican Gigante by that time. The defendants' expert, Dr. Gary Frazier, does not directly dispute these findings. He states only that his interpretation of the raw data shows that overall awareness of the Mexican Gigante was 20% in 1990.[6] (Frazier Rpt. p. 12.)

The plaintiffs have thus presented credible and essentially undisputed evidence that shows between 20–22% of Mexican–Americans in the San Diego area were aware of their Gigante mark when the defendants' opened their first Gigante store in San Diego. *See, e.g., McCarthy, supra,* § 32:190 (stating there is no logical reason to require higher percentage to prove secondary meaning than to prove likelihood of confusion); *see also Exxon Corp. v. Texas Motor Exch. of Houston, Inc.,* 628 F.2d 500, 507 (5th Cir.1980) (finding likelihood of confusion where survey showed 15–23% of respondents were confused); *James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 279 (7th Cir. 1976) (15%); *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1061 (2d Cir. 1979) (15–20%). The Court thus finds that, as of August 1991, the plaintiffs had a legally protectable right to use the name Gigante, at least in the San Diego area.[7]

---

6. Dr. Frazier disputes whether mere name awareness constitutes market awareness. In his opinion, although the Ross study may have measured name recognition, it did not measure either image awareness or how strong the Gigante mark was among consumers who had heard of it. Dr. Frazier also

believes that 28% name awareness is insufficient to establish a famous or strong mark.

7. Because the Court finds that the plaintiffs have a legally protectable right to use the Gigante name under federal law, it does not address the plaintiffs' argument that trademark rights under California are established

#### b. Likelihood of confusion

In addition to establishing a valid, protectable interest in the Gigante mark, in order to prevail on their infringement and unfair competition claims, the plaintiffs must show that the defendants' use of the Gigante mark creates a likelihood of confusion. "The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." *Brookfield,* 174 F.3d at 1053 (internal quotes and cites omitted). Thus, for the plaintiffs to prevail, they must not only show that they have a protectable interest in the Gigante mark, but also that the public is likely to be confused about the source or sponsorship of the defendants' Gigante grocery stores.

 In this circuit, likelihood of confusion is determined by analyzing the following factors: 1) similarity of the conflicting marks; 2) relatedness or proximity of the two companies' products or services; 3) strength of the senior user's mark; 4) marketing channels used; 5) degree of care likely to be exercised by purchasers in selecting goods; 6) the junior user's intent in selecting the mark; 7) evidence of actual confusion; and 8) the likelihood of expansion in product lines. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979); *Brookfield,* 174 F.3d at 1053. Although all eight factors are relevant to the analysis, the similarity of the marks, the relatedness of the products or services, and the use of common marketing channels are the most important. *See GoTo. com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 (9th Cir.2000).

 After analyzing all of the factors, the Court finds that a likelihood of confusion exists.

#### i. Similarity of conflicting marks

"Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft,* 599 F.2d at 351. In this case, the two marks are almost identical. "Gi-

gante" is Spanish for "giant", a fact that is no doubt well known to the parties' predominately Mexican–American customers. Both marks are spelled the same, pronounced the same, and have the same meaning. The marks do, however, look somewhat different. Although both parties write the word "Gigante" in red capital letters, the typefaces are different. (*Compare* Frias Decl., Ex. O, *with* O'Brien Decl., Ex. U.) In determining whether two marks are similar, however, "similarities weigh more heavily than differences." *Id.*

Overall, the Court finds that the two marks are substantially similar in sight, sound, and meaning. This factor thus supports a finding that a likelihood of confusion exists.

#### ii. Relatedness of the companies' products or services

"For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft,* 599 F.2d at 350. As the Ninth Circuit has observed, where two marks are virtually identical, "if they were used with identical products or services likelihood of confusion would follow as a matter of course." *Brookfield,* 174 F.3d at 1056. In this case, in addition to using substantially similar marks, the parties offer very similar products and services. Both parties operate grocery stores that carry Mexican specialty foods, that cater to Mexican–American grocery shoppers, and that are located in areas having significant Mexican–American (or Mexican) populations. (*See* Ps 'SUF Nos. 70 and 71.)

Because the parties offer similar goods and services, the Court finds that this factor supports a finding that a likelihood of confusion exists.

#### iii. Marketing channels used

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft,* 599 F.2d at 353. The plain-

through priority of use either inside or outside of the state.

tiffs argue that the parties use the same marketing channels because they both "target and cater primarily to Mexican–American grocery shoppers in Southern California." (*See* Ps MPA p. 22.) The defendants argue that the parties' marketing channels are not convergent because the parties are currently serving "wholly different geographic markets." (*See* Ds Opp. p. 21.)

Although it is undisputed that the parties target a similar market, it is not clear that the parties use convergent marketing channels to reach that market. The defendants' primary marketing device is a weekly flyer inserted into the PennySaver advertising circular and distributed within a three-mile radius of their two Gigante stores in San Diego. (*See* Ps SUF No. 94.) The defendants have also advertised on Radio Latina. (*See* M. Dallo Depo. pp. 25–26.) It is not known, however, where Radio Latina is located or broadcast, and it appears that the defendants last advertised on Radio Latina in 1996. (*Id.*)

The plaintiffs, on the other hand, do not market their stores through weekly flyers inserted in the PennySaver. They advertise their three Los Angeles area stores on Spanish language television and radio stations broadcast from Los Angeles County, and in Spanish language newspapers published in Los Angeles County. (Ps SUF No. 85.) Similarly, they advertise their Baja California stores on Mexican radio and television stations and in Mexican newspapers. (Ps SUF Nos. 46, 55.)

Thus, while the parties do seek to attract a similar segment of the population, they do not use the same marketing channels to attract that segment.

Although the parties use different media, the Court nonetheless finds it important that the parties use that media to attract a similar segment of the population. One of the plaintiffs' arguments in this case is that they have always sought to attract Southern Californians in general, and San Diegans in particular, to their Baja stores. (Ps SUF No. 53.) The defendants dispute the plaintiffs' assertion

that a large percentage of their customers are from the United States. It is undisputed, however, that the plaintiffs advertise their Baja stores on Mexican television and radio stations which "are broadcast across the border into Southern California", (Ps SUF No. 46), and that people who live in San Diego have access to some forms of media that originate in Tijuana, such as newspapers, television and radio, (Ds Resp. to Ps SUF Nos. 51 and 56). It is also undisputed that at least some of the plaintiffs' Mexico-based advertising has spilled over the border into the United States because some of the defendants' employees have seen the plaintiffs' advertisements. (Ds Resp. to Ps SUF No. 56.) Additionally, the plaintiffs have run at least two ads for their Baja stores in Orange County newspapers, and at least one ad for their Baja stores in a San Diego newspaper. (Ds Resp. to Ps SUF No. 57.) Finally, the plaintiffs have conducted promotions for their Mexican stores at *Universal Studios* in Los Angeles and *Sea World* in San Diego. (Ps SUF No. 64.)

Thus, while the defendants dispute the plaintiffs' assertion that much of the advertising for their Baja stores is specifically directed at Southern California customers, it is undisputed that the plaintiffs have done at least some advertising in San Diego, and that some of their Mexico-based advertising has spilled over into San Diego. Although the parties use different media to market their stores, the Court finds that there is necessarily *some* convergence of marketing channels because of the fact that the parties are both attempting to reach the same market. For example, it is not unreasonable to assume that potential customers who live near the defendants' San Diego stores have seen both the defendants' PennySaver inserts and the plaintiffs' Mexico-based advertising or the plaintiffs' limited advertising in San Diego.

Overall, the Court finds that this factor supports a finding that a likelihood of confusion exists, but only slightly.

#### iv. Strength of the senior user's mark

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Brookfield*, 174 F.3d at 1058. "The strength of a mark is determined by its placement on a continuum of marks from 'generic,' afforded no protection; through 'descriptive' or 'suggestive,' given moderate protection; to 'arbitrary' or 'fanciful' awarded maximum protection." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir.1992) (internal quotes and cites omitted).

The parties do not really discuss this issue. The plaintiffs argue that the Gigante mark is "wholly arbitrary and fanciful", and thus an inherently strong mark. (*See* Ps MPA p. 22.) The defendants argue that the Gigante mark is merely descriptive. (*See* Ds MPA p. 20.) The Court finds that the Gigante mark is either descriptive or suggestive. *See, e.g., Sleekcraft*, 599 F.2d at 349 (noting that the line separating descriptive marks from suggestive marks is uncertain).

Arbitrary or fanciful marks consist of words that have been coined or invented for the sole purpose of functioning as trademarks (i.e., "Kodak"), or words that are in common usage but that, when combined with the goods or services, neither suggest nor describe the goods or services (i.e., "Apple" computers). *See McCarthy*, §§ 11:5–11:14 at 11–12 to 11–20. The word *Gigante*, which means *giant* in Spanish, was clearly not coined for the purpose of designating the plaintiffs' grocery stores. Moreover, the Court finds that the word either suggests or describes the

plaintiffs' goods or services. The mark is descriptive in the sense that it tells the consumer something about the grocery store, i.e., that it is very big or that it carries a wide variety of products, or both. On the other hand, the mark could also be classified as suggestive, because the consumer must make an imaginative leap from the word *Gigante* to the idea that this is a very big grocery store that carries a wide variety of products. However, regardless of whether the mark is more appropriately classified as descriptive or suggestive, the plaintiffs have presented some evidence showing that California consumers associate the Gigante name with their chain of grocery stores. (*See* Ps SUF Nos. 37 and 38.)[8] Overall, the Court finds that the plaintiffs' Gigante mark is at least moderately strong. Moreover, "in situations in which the appearance of the conflicting marks and the services provided are almost identical, the strength of the mark is of diminished importance in the likelihood of confusion analysis." *GoTo.com*, 202 F.3d at 1208 (internal quotes and cites omitted).

The Court thus finds that this factor slightly supports a finding that a likelihood of confusion exists.

#### v. Degree of care likely to be exercised by purchasers in selecting goods

The Court finds that a reasonable consumer is unlikely to exercise a high degree of care in selecting a grocery store. *See, e.g., E. & J. Gallo*, 967 F.2d at 1293 (upholding district court finding that consumers tend to exercise less care when purchasing lower cost items like wine and cheese). This factor thus weighs slightly

---

8. In addition to the Ross Report, which showed that 28% of Mexican–Americans in San Diego County were aware of the plaintiffs' Gigante mark, the plaintiffs presented evidence of a marketing survey of Mexican–Americans done in East Los Angeles, Pacoima, and Pomona in 1998. Of the 240 people surveyed, 70% had heard of Gigante (aided awareness). The surveyor concluded that the Gigante name was very well known. Al-

though the defendants do not dispute the fact that 70% of those surveyed had heard of Gigante, they point to another portion of the survey that concluded "Gigante does not currently have a unique image or any perceived strengths or weaknesses in terms of its direct competition." According to the defendants' expert, Dr. Gary Frazier, name awareness alone, without image awareness, does not constitute strength.

in favor of finding that a likelihood of confusion exists.

### vi. The junior user's intent in selecting the mark

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354. Although intent to confuse consumers can constitute strong evidence of confusion, "[t]he converse...is not true: the lack of intent by a defendant is largely irrelevant in determining if consumers likely will be confused as to source." *Brookfield*, 174 F.3d at 1059, quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 287 (6th Cir.1997).

The plaintiffs argue that this factor favors them. They suggest that the defendants knew about the Mexican Gigante stores prior to naming their first San Diego Gigante store, and that the defendants thus selected the name in order to capitalize on the plaintiffs' goodwill. (*See* Ps MPA pp. 24–25.) The plaintiffs' suggestion, however, is just that: a suggestion. They have presented no evidence to support a finding of bad faith on the part of the defendants.[9] The Court thus finds that this factor is irrelevant.

### vii. Evidence of actual confusion

Although not required to prove that confusion is likely, "[e]vidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352. In this case, there is some evidence that both consumers and vendors have been confused. For example, the defendants' employees have testified that some of the San Diego stores' customers have asked whether the defendants were affiliated with the Gigante stores in Mexico, and that some of their customers have tried to use the plaintiffs' Gigante discount cards at the defendants' Gigante stores. (Ps SUF No. 77.) There have also been instances of vendor confusion, where the plaintiffs received products or bills that were supposed to have gone to the defendants' stores, and vice versa. (Ps SUF No. 79.)

This factor thus supports a finding that a likelihood of confusion exists.

### viii. The likelihood of expansion in product lines

"[A] 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing. When goods are closely related, any expansion is likely to result in direct competition." *Sleekcraft*, 599 F.2d at 354 (internal quotations and citations omitted). Here, it is undisputed that the plaintiffs plan to open stores in San Diego County within the next several years. (Ps SUF No. 83.) Moreover, regardless of whether or not the plaintiffs' actually intended to do so, given the fact that they have operated stores in Tijuana since 1987, and the fact that they have already expanded into Southern California, the Court finds that San Diego is in the plaintiffs' natural zone of expansion.

This factor thus favors a finding that a likelihood of confusion exists.

### ix. Balancing of all eight factors

The Court thus finds that of the three most important factors, two strongly favor a finding of likelihood of confusion (similarity of marks and relatedness of products),

---

9. It is undisputed that the defendants purchased their first Gigante store from Mr. Zuhair Hirmez in June 1991, and that at the time the store had not yet opened for business. (*See* Ds SUF Nos. 1 and 2.) It is also undisputed that, prior to the defendants' purchase, Mr. Hirmez had already named the store Gigante upon the suggestion of someone he knew. (*See* Ps Resp. to Ds SUF No. 2.) At the hearing on these motions, the plaintiffs' counsel argued that the person who came up with the name must have known about the plaintiffs' stores. Although the Court can understand why the plaintiffs might believe that the defendants' first Gigante store was named with the plaintiffs' stores in mind, there is simply no evidence before the Court that shows the plaintiffs' belief is well founded.

and one slightly favors a finding of likelihood of confusion (convergence of marketing channels). Of the remaining five factors, two favor a finding of likelihood of confusion, two slightly favor a finding of likelihood of confusion, and one is irrelevant. Overall, the Court finds that the plaintiffs have established that a likelihood of confusion exists, and that the plaintiffs are thus entitled to summary judgment on their infringement and unfair competition claims.

### 2. The Plaintiffs' Claims for Trademark Dilution

In addition to asserting claims for trademark infringement and unfair competition, the plaintiffs have asserted claims for trademark dilution under federal and state law. Although the plaintiffs have not moved for summary judgment on these claims, the defendants have so moved. The defendants argue that they are entitled to summary judgment on the plaintiffs' dilution claims because the undisputed facts show that the plaintiffs' mark is not famous enough to be entitled to protection from dilution.[10]

"Dilution is a cause of action invented and reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge on their value." *Avery Dennison*, 189 F.3d at 875. "Unlike infringement and unfair competition laws, in a dilution case competition between the parties and a likelihood of confusion are not required to present a claim for relief." *Id.* at 873; *see also Star Markets, Ltd. v. Texaco, Inc.*, 950 F.Supp. 1030, 1037 (D.Haw.1996) (noting that finding of trade-

mark dilution does not necessarily flow from finding of trademark infringement). Only famous marks are protected under the Federal Trademark Dilution Act. *See* 15 U.S.C. § 1125(c)(1). Similarly, California's anti-dilution statute protects only famous marks, *see Avery Dennison*, 189 F.3d at 874; *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1539 (9th Cir. 1989); *see also* Cal. Bus. Prof.Code § 14330 (stating injunctive relief available to protect against "dilution of the distinctive quality of a mark"), and a trademark dilution claim under California law "is subject to the same analysis as [a] federal claim", *Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1324 (9th Cir.1998). "[T]o meet the 'famousness' element of protection under the dilution statutes, a mark [must] be truly prominent and renowned." *Avery Dennison*, 189 F.3d at 875 (internal quotes and cites omitted). Furthermore, merely showing that the trademark in question is either inherently distinctive or has acquired distinctiveness through secondary meaning "is nowhere near sufficient to achieve the status of 'famous mark' under the anti-dilution statute." *See McCarthy*, § 24:91.1 at 124–156; *see also Avery Dennison*, 189 F.3d at 875 (stating dilution protection is not accorded to trademarks based only on showing of inherent or acquired distinctiveness).

Injunctive relief is available in a trademark dilution case if the plaintiffs can establish both that they own a mark that is famous *and* that the defendants began using the plaintiffs' mark *after* it had become famous. 15 U.S.C. § 1125(c) ("[t]he owner of a famous mark shall be

10. The defendants also argue that they are entitled to summary judgment on the plaintiffs' dilution claims because the plaintiffs do not own the Gigante mark. As discussed above, the Court finds otherwise. The defendants also argue that the plaintiffs' federal dilution claim must fail because their use of the Gigante mark pre-dates the Federal Trademark Dilution Act, and the Act is not retroactive. Although this issue has not yet been addressed by the Ninth Circuit, other courts have held that it is possible to obtain

prospective injunctive relief against a diluting use that began before the January 1996 effective date of the Act. *See, e.g., Viacom Inc. v. Ingram Enters., Inc.*, 141 F.3d 886, 888–89 (8th Cir.1998); *Fuente Cigar, Ltd. v. Opus One*, 985 F.Supp. 1448, 1451–52 (M.D.Fla. 1997); *but see Circuit City Stores v. OfficeMax, Inc.*, 949 F.Supp. 409, 416 (E.D.Va.1996) (holding plaintiff could not enjoin diluting use of mark that first began prior to date Federal Dilution Act became law).

entitled ... to an injunction against another person's ... use ... of a mark or trade name, *if such use begins after the mark has become famous* .... ") (emphasis added); *Panavision,* 141 F.3d at 1324. Thus, in order to prevail on their dilution claims, the plaintiffs must show that their Gigante mark was famous enough to qualify for protection from dilution as of August 1991, when the defendants first began using the Gigante mark. Under both federal and California law, courts are instructed to consider the following eight non-exclusive factors in determining whether a mark is famous enough to qualify for protection from dilution: (1) the degree of inherent or acquired distinctiveness of the mark; (2) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (3) the duration and extent of advertising and publicity of the mark; (4) the geographic extent of the trading area in which the mark is used; (5) the channels of trade for the goods or services with which the mark is used; (6) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (7) the nature and extent of use of the same or similar marks by third parties; and (8) whether the mark is registered. 15 U.S.C. § 1125(c).

### a. The mark's inherent or acquired distinctiveness

"To be capable of being diluted, a mark must have a degree of distinctiveness and strength beyond that needed to serve as a trademark." *Avery Dennison,* 189 F.3d at 876 (internal cites and quotes omitted). As discussed above, the Court has already found that the plaintiffs' Gigante mark is at least moderately strong. The Court found that the mark *Gigante,* which means *giant* in Spanish, is either descriptive or suggestive of the plaintiffs' stores (i.e., it either described stores that were very big or that carried a wide variety of groceries, or it suggested this fact). Regardless of whether the mark was descriptive or suggestive, the Court found that the plaintiffs

had presented evidence showing that the mark had acquired secondary meaning in their target market (i.e., grocery purchasing Mexican–Americans in Southern California).

In analyzing whether the plaintiffs had shown that a likelihood of confusion existed, the Court examined the current strength of the plaintiffs' mark. In particular, the Court noted that the plaintiffs had presented evidence that showed that, as of 1998, 70% of Mexican–Americans in the Los Angeles area had heard of the plaintiffs' Gigante mark. In determining whether the plaintiffs are entitled to dilution, however, the Court must examine the strength or distinctiveness of the plaintiffs' Gigante mark at the time the defendants began using the Gigante mark. 15 U.S.C. § 1125(c) (stating owner of famous mark entitled to injunction if defendant began using the mark "after the mark has become famous"). The only evidence of the strength or distinctiveness of the plaintiffs' Gigante mark in 1991 is the Ross Report. According to that report, as of the time the defendants began using the name Gigante, 22% of Mexican–Americans in San Diego had heard of the plaintiffs' Gigante mark. Although the plaintiffs' Gigante mark was strong enough in 1991 to qualify for protection from infringement, the claim that it was also strong enough to qualify for protection from dilution is much less compelling. *See, e.g., Avery Dennison,* 189 F.3d at 877 (finding that although trademarks "Avery" and "Dennison" had achieved secondary meaning on a national level, this was not enough to persuade court that famousness prong was met).

Overall, the Court finds that the plaintiffs' Gigante mark had achieved only a moderate degree of distinctiveness as of 1991, and that this factor suggests that the plaintiffs' mark was not famous enough to qualify for protection from dilution.

### b. Duration and extent of the mark's use

As of 1991, the plaintiffs had been using the Gigante mark on stores in Mexico for

almost 30 years. However, they did not open their first Gigante stores in Baja California or Tijuana until 1987. (Ds SUF No. 26.) As of August 1991, when the defendants first began operating a store under the Gigante mark, the plaintiffs operated six Gigante stores in Baja California: two in Tijuana, two in Ensenada, and two in Mexicali. (Ds SUF No. 27; Ps SUF No. 32.) For purposes of this lawsuit, the Court thus finds that the plaintiffs' use of the Gigante mark was neither long-standing nor geographically extensive, and that this factor suggests that the plaintiffs' mark was not famous enough to qualify for protection from dilution.

### c. Duration and extent of advertising and publicity of the mark

There is very little evidence in the record regarding the duration and extent of the plaintiffs' California advertising [11] as of 1991, and what little evidence there is suggests that such advertising was not great. The plaintiffs have submitted as undisputed the fact that, "Since 1987 Gigante's border stores have advertised in Mexican-based Spanish language newspapers, and on Mexican-based Spanish language television and radio stations," (*see* Ps SUF No. 54), and the fact that between 1987 and 1991, the plaintiffs "advertised in the largest Tijuana and Mexicali newspapers … and on ten (10) local Tijuana radio stations …. The radio … advertisements were typically broadcast between 10–20 times a day" (*see* Ps SUF No. 55). In support of these two facts, the plaintiffs have submitted the declaration of Gerardo Garcia, the Advertising Manager of the plaintiffs' Baja California Division. (*See* Garcia Decl. ¶ 1.)

Garcia began working as the Advertising Manager for the Baja California Division in July 1989. (*Id.* ¶ 2.) He states that,

when he was hired, the plaintiffs advertised on approximately ten radio stations that broadcast out of Tijuana, and that these radio stations typically ran between 10 to 20 radio spots for the plaintiffs each day. (*Id.* ¶ 7.) He does not explain, however, how he knows how much radio advertising the plaintiffs did prior to his date of hire,[12] and he does not state how much advertising the plaintiffs did between his date of hire and August 1991. Garcia also states that, when he was hired, the plaintiffs were advertising in various Baja California newspapers, including *El Mexicano* and *La Voz,* both of which are distributed and sold on the United States side of the border. (*Id.* ¶ 8.) Garcia does not state, however, how often the plaintiffs advertised in *El Mexicano* or *La Voz* from the time he was hired until August 1991. Moreover, Garcia does not describe any of the plaintiffs' advertising activities from his date of hire through 1991. The only advertising data that Garcia provides from the relevant time period is data on national advertising expenditures. Garcia states that in 1990 and 1991, the plaintiffs spent over $12 million on advertising and promotional activities for its Mexico stores. (*Id.* ¶ 17, Ex. G.) Although Garcia states that "[m]any times these national promotions will be broadcast on various television and radio stations throughout the boarder region," (*id.* ¶ 17), the Court cannot tell how much, if any, of this $12 million was spent on advertising and promotional activities for the plaintiffs' Tijuana stores, or how much of its Tijuana advertising spilled over into the United States.[13] Finally, Garcia states, "[b]eginning in 1991, I was given authority by national headquarters to personally begin contracting with local television stations in Baja California to broadcast Gigante ad-

11. By California advertising, the Court means advertising that either originated in California, or Mexico-based advertising that spilled over into California.

12. The defendants have properly objected that some of Garcia's statements lack foundation to the extent that he seeks to establish adver-

tising activities that pre-date his July 1989 date of hire.

13. As discussed above, although it is unclear how much of the plaintiffs' Mexico-based advertising spilled over into California, it is undisputed that at least some of it did.

vertisements and promotions." (*Id.* ¶ 11.) It thus appears that the plaintiffs did not begin television advertising until some time in 1991, if not later.[14]

At best, Garcia's declaration supports a finding that, as of 1991, the plaintiffs had done an unquantified amount of radio and newspaper advertising in Baja California and Tijuana, and a finding that at least some of this advertising had spilled over into the San Diego area.

Based on the evidence before it, the Court finds that, as of 1991, the plaintiffs' California advertising had been limited to no more than four years of Mexico-based radio and newspaper ads, that the amount of this radio and newspaper advertising is unknown, and that some of this advertising reached the San Diego area. This factor thus suggests that, as of 1991, the plaintiffs' Gigante mark was not famous enough to qualify for protection from dilution.

### d. The geographic extent of the trading area in which the mark is used

As of 1991, the plaintiffs used the Gigante mark throughout Mexico. For purposes of this case, however, the relevant geographic trading area is that portion of the United States in which the plaintiffs' mark had achieved some degree of renown. As of 1991, there is no evidence to suggest that the plaintiffs' use of the Gigante mark in the United States extended beyond a fairly small area around the United States–Mexico border. (*See, e.g.,* Ps SUF No. 37.) The limited geographic area within which the plaintiffs' mark was used in 1991 strongly suggests that it was not famous enough to qualify for protection from dilution. *See, e.g., McCarthy,* § 24:92 at 24–164 (stating that mark ordinarily should not be deemed famous unless it has been used on a substantially national scale); *Star Markets, Ltd. v. Texaco, Inc.,* 950 F.Supp. 1030, 1035 (D.Haw.1996) (holding that "fame in only one state mili-

tates strongly against meriting protection from dilution under federal law").

### e. Channels of trade for the goods or services with which the mark is used

According to McCarthy, "[t]his factor merely requires the court to define the product or service line or market within which the plaintiff's mark is used and has become famous." *McCarthy,* § 24:92 at 24–166. As discussed above, the Court finds that the plaintiffs' Gigante mark, and its grocery stores, were known to a relatively small market as of 1991: Mexican–Americans who lived in San Diego County.

### f. The mark's degree of recognition in the trading areas and channels of trade used by the plaintiffs and the defendants

The Court finds that this factor overlaps somewhat with the first factor. This factor looks at how recognizable or famous the plaintiffs' Gigante mark was in the defendants' trading area (i.e., the San Diego area). As discussed above, the Ross Report shows that, as of 1991, 22% of Mexican–Americans in San Diego were aware of the plaintiffs' Gigante mark. Although this level of recognition is sufficient to protect the plaintiffs' mark from infringement, the Court finds that it is not sufficient to establish that the plaintiffs' mark is famous enough to be protectable from dilution. *See, e.g., McCarthy, supra,* § 24:92 at 24–168 (stating that mark should not be considered famous unless it is known to more than 50% of defendant's potential customers); *Ringling Brothers— Barnum & Bailey Combined Shows, Inc., v. Utah Div. of Travel Dev.,* 955 F.Supp. 605, 613 n. 4 (E.D.Va.1997) (finding mark was famous, in part, because survey evidence shows that mark was recognized by over 40% of nationwide class of respondents).

---

**14.** For example, although Garcia states he "began contracting" with local television stations in 1991, he does not state when these contracts were executed or when the television ads and promotions began running.

### g. Use of the same or similar marks by third parties

Evidence of a mark's use by others "is relevant because, when a mark is in widespread use, it may not be famous for the goods or services of one business." *Avery Dennison*, 189 F.3d at 878 (internal quotes and cites omitted); *see also McCarthy, supra*, § 24:92 at 24–169 ("A mark that is merely one in a 'crowd' of similar marks will not usually be 'famous' "); *Star Markets*, 950 F.Supp. at 1035 (holding that the more often mark is used in connection with a variety of goods and services, the less likely it is that the plaintiff's use of the mark will signify something unique or particular). The defendants have submitted undisputed evidence that third parties have used the mark *Gigante* or *Giant* (its English translation). For example, the defendants have submitted the results of an online search of the United States Patent and Trademark Office database that indicates federal trademark registrations have been issued for the marks "Gigante," "El Gigante," and "Gigante Express." (*See* Ds SUF No. 62.) The defendants have also submitted evidence showing that several federal trademark registrations have been issued for the mark "Giant", including "Giant Food," "Giant G," and "Little Giant Food Stores." (*See* Ds SUF No. 63.) The fact that others have registered the mark *Gigante* or *Giant*, or some variation thereof, cuts against a finding that the plaintiffs' mark is famous enough to qualify for protection from dilution.

### h. Whether the mark is registered

Although the plaintiffs' mark has been registered with the state, it has not been federally registered. This factor thus suggests that the plaintiffs' mark is not famous enough for protection from dilution under federal law, although it may suggest that the mark is famous enough for protection from dilution under state law.

### i. Balancing of all eight factors

All eight of the factors discussed above suggest that the plaintiffs' mark is not famous enough to qualify for protection from dilution under federal law, and seven of the eight factors suggest that the plaintiffs' mark is not famous enough to qualify for protection under state law. Based on the above, the Court finds that the plaintiffs are unable to show that, as of 1991, their Gigante mark was famous enough in the United States to qualify for protection from dilution. The Court thus grants the defendants' motion for summary judgment on the plaintiffs' two dilution claims.

### 3. The Defendants' Cancellation of Registration Claim

In their opposition to the plaintiffs' motion for partial summary judgment, the defendants argue, for the first time, that they are entitled to summary judgment on their counterclaim for cancellation of the plaintiffs' trademark. It goes without saying that a party may not move for summary judgment in its opposition papers. However, because the plaintiffs' have responded to the defendants' argument, and in the interest of judicial economy, the Court will address the defendants' argument.

California Business & Professions Code § 14281 provides that the Secretary of State shall cancel the registration of any trademark upon finding that the registrant is not the owner of the mark or that the registration was obtained fraudulently. The defendants argue that the plaintiffs' registration should be canceled because the registration was fraudulently obtained. The Court finds that the defendants have not established fraud.

The plaintiffs obtained registration for both a trademark and a service mark. The plaintiffs registered the Gigante trademark for canned fruits and vegetables, dairy products, coffee, sauces, pasta, rice, flour, salsa, pastry, and cake mixes. This registration states that the Gigante trademark was first used in California "as early as 1/14/98." They also registered the Gigante service mark for wholesale and retail distribution of groceries. Like the trademark registration, this registration

states that the Gigante service mark was first used in California "as early as 1/14/98." The defendants argue that the statements concerning first use are false because the plaintiffs were not qualified to do business in California until June 1998, and they did not open their first grocery store in California until May 1999.

From the evidence presented, the Court finds that the statement contained in the trademark registration is not false. It is undisputed that the plaintiffs offer private label products marketed under the name "Seleccion Gigante." (*See* Ds SUF No. 24.) It is also undisputed that, sometime in 1996 and 1997, the plaintiffs imported these private label goods to California, until poor sales halted the importation. (*See* Ds Supp. SUF No. 12; Ds Add'l Fact No. 101.) The Court thus finds that the statement that the plaintiffs used the Gigante trademark in California on canned vegetables and the like "as early as 1/14/98" is not false.

The Court also finds that the statement contained in the service mark registration is not false. Since 1995, the plaintiffs have leased a facility in San Diego that consisted of administrative offices and a warehouse. (*See* Ps SUF No. 35.) The warehouse was used to import and export goods between the United States and Mexico. (*Id.*) Although it is not specifically stated, presumably the warehouse was used to export the plaintiffs' private label goods to the United States. The Court finds that, through the San Diego warehouse, the plaintiffs in all likelihood were engaged in the wholesale distribution of groceries. Whether or not the plaintiffs were engaged in the retail distribution of groceries in California as early as 1998 within the meaning of California law is a much closer call. *See* Cal. Bus. & Prof. Code § 14209 (stating trademark is used in California when goods are sold or services are rendered in state). However, in order to show fraud, the defendants must show that the plaintiffs made the statement with the intent to deceive. The defendants have presented no evidence that shows the plaintiffs made the statement with the intent to deceive. Indeed, the evidence submitted by both parties strongly suggests that the plaintiffs believed they were using the Gigante mark in California by virtue of their marketing efforts directed at Californians.

The Court thus denies the defendants' motion for summary judgment on their counterclaim for cancellation.

### 4. Laches

■ The defendants have asserted a laches defense to the plaintiffs' trademark infringement and unfair competition claims.[15] "Laches can bar recovery in trademark or tradename actions where injunctive relief is sought." *E–Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir.1983). "Laches is a question of law and may be determined on summary judgment." *MDT Corp. v. New York Stock Exch., Inc.*, 858 F.Supp. 1028, 1033 (C.D.Cal.1994); *see also American Int'l Group v. American Int'l Bank*, 926 F.2d 829, 831 (9th Cir.1991) (holding court may properly grant summary judgment on basis of laches). The defendants argue that the plaintiffs should be barred from recovery because they unreasonably delayed in attempting to enforce their right to use the Gigante mark in California. The Court finds this argument persuasive.

**15.** The defendants have also asserted a statute of limitations defense. (*See* Ds Reply to Ps Opp. to Ds MSJ p. 14.) Although the defendants raised a laches defense in their opposition to the plaintiffs' motion for summary judgment, the first time they raised a statute of limitations defense was in their reply brief. The Court need not, and does not, consider arguments raised for the first time in a reply brief. *See, e.g., United States v. Cox*, 7 F.3d 1458, 1463 (9th Cir.1993). Moreover, in a trademark infringement suit, it is laches, rather than the statute of limitations, that is generally invoked to determine whether the plaintiffs have waited too long to bring suit. *See McCarthy*, § 31:33 at 31–71 (noting that because infringement is a continuing wrong, statute of limitations is usually no bar to suit for injunctive relief).

■ Before discussing the merits of the laches defense, the Court notes that the plaintiffs have argued that the defendants waived the defense by failing to assert it in their answer to the complaint. The Court is not persuaded by this argument. The defendants asserted affirmative defenses based on the statute of limitations and estoppel. Laches is an equitable defense that is closely analogous in purpose to the statute of limitations. Moreover, the terms "laches", "estoppel", and "estoppel by laches" are often used interchangeably. The Court thus finds that the defendants adequately raised the defense of laches in their answer to the complaint.

■ In a trademark case, the existence of laches is determined by considering six factors: (1) the strength and value of the trademark rights asserted; (2) the senior user's diligence in enforcing the mark; (3) the harm to the senior user if relief is denied; (4) whether the junior user acted in good faith ignorance of the senior user's rights; (5) the degree of competition between the senior and junior users; and (6) the extent of harm suffered by the junior user because of the senior user's delay in asserting its rights. *E–Systems*, 720 F.2d at 607. After analyzing all of these factors, the Court finds that laches bars the plaintiffs' request for injunctive relief.

### a. Strength and value of trademark rights asserted

As the Court has already found, (*see* § B.1.b.iv., above), the plaintiffs' Gigante mark is only moderately strong.

### b. The plaintiffs' diligence in enforcing the mark

The Court finds that the plaintiffs have not been diligent in enforcing their mark. The defendants opened their first grocery store under the Gigante name in August 1991. It is undisputed that the plaintiffs first learned of this store in 1995. (Ds SUF No. 37.) The plaintiffs, however, did not contact the defendants at that time.[16] Meanwhile, in late 1996, the defendants opened their second Gigante store in San Diego.

The parties finally met for the first time in June 1998 after Michael Dallo, one of the San Diego stores' owners, learned that Justo Frias, the Director of Operations of the plaintiffs' Baja Division, wanted to meet with him. (*See* Ds SUF No. 40 and Ps Resp. thereto.) During that meeting, Frias either accused Dallo of selecting the Gigante name in hopes of being bought out by the plaintiffs, or he told Dallo that the defendants were using the Gigante name unlawfully and that the name belonged to the plaintiffs. (*See* Ds SUF No. 41 and Ps Resp. thereto.) Dallo was insulted by this accusation and terminated the meeting. (Ds SUF No. 41.) Despite the clear suggestion that the defendants did not intend to stop using the Gigante name, the plaintiffs still did nothing.

The parties had no further contact for another year. (Ds SUF No. 43.) In May 1999, the plaintiffs opened their first United States Gigante store in Pico Rivera. (*Id.*) Two months later, on July 20, 1999, the defendants' counsel sent the plaintiffs a cease and desist letter. (Ps SUF No. 26; Ds SUF No. 43.) Less than two weeks after receiving the cease and desist letter, the plaintiffs filed the present lawsuit.

---

16. The plaintiffs argue that they did not act on this information immediately because Justo Frias, the Director of Operations of the plaintiffs' Baja Division and the person who first learned of the defendants' Gigante stores, had recently been kidnapped and because the plaintiffs had put their plans to open a store in San Diego on hold. This does not, however, diminish the finding that the plaintiffs unreasonably delayed in asserting their rights. The temporary absence of one of the plaintiffs' executives should not have stopped such a large company from acting. Moreover, regardless of whether or not the plaintiffs intended to open a Gigante store in San Diego in 1995, once they learned of the defendants' use of the name, they should have acted.

(Ds SUF No. 44.) In their moving papers, the plaintiffs state that they were "[f]aced with no alternative," and that they filed this lawsuit to establish their entitlement to use the Gigante name. (*See* Ps MPA p. 1.) Thus, in the absence of the defendants' cease and desist letter, there is no evidence that the plaintiffs would have acted to enforce the mark.

Based on the above, the Court finds that the plaintiffs have not been diligent in enforcing their mark.

### c. The harm to the plaintiffs if relief is denied

The plaintiffs request an order enjoining the defendants from using the Gigante name on their two San Diego stores. The Court does not find that the plaintiffs will be unduly harmed if this request is denied.

The parties have co-existed on both sides of the United States–Mexico border for almost ten years. The Court finds no threat of great harm to the plaintiffs if the status quo were to be maintained. In making this finding, the Court relies. extensively on the fact that the defendants' two San Diego stores draw their customers from, and advertise in, a limited geographic area, and on the fact that the defendants have no plans to open new stores under the Gigante name. (Ps SUF No. 93.) Moreover, although the plaintiffs have begun to expand into California, they are currently operating only three stores in the Los Angeles area. There is no evidence that the plaintiffs' Los Angeles customers will be confused or the plaintiffs' Los Angeles operations will be harmed if the defendants are allowed to keep operating their two San Diego stores under the Gigante name.

### d. Whether the defendants acted in good faith ignorance of the plaintiffs' rights

As discussed above, (*see* § B.1.b.vi., above), the Court finds no evidence that the defendants acted in bad faith in opening their first store under the Gigante name in 1991. And although it is undis-puted that the defendants had heard of the plaintiffs' stores by the time they opened their second Gigante store in 1996, the Court cannot say it was unreasonable for the defendants to open a second store under a name that they had already used for five years.

### e. The competition between the plaintiffs and the defendants

There is no evidence in this case that suggests the defendants compete for customers with the plaintiffs' Los Angeles Gigante stores. And although they might compete for customers with the plaintiffs' Tijuana Gigante stores, as noted above, the plaintiffs and the defendants have managed to co-exist on both sides of the United States–Mexico border for almost ten years.

### f. The harm suffered by the defendants because of the plaintiffs' delay

The defendants opened their second Gigante store in late 1996 or early 1997. By that time, the plaintiffs had been aware of the defendants' Gigante store for over a year. Had the plaintiffs asserted their rights in 1995, this issue would undoubtedly have come to a head sooner, and the defendants might not have begun operating a second store under the Gigante name. Because of the plaintiffs' delay, the defendants are now threatened with having to change the name on two of their stores rather than one.

After having considered all of the above factors, the Court finds that laches bars the plaintiffs' request for injunctive relief. In addition to the plaintiffs' delay in filing suit to enforce their mark and the harm to the defendants because of the plaintiffs' delay, this finding is greatly influenced by the fact that the defendants currently operate only two Gigante stores in San Diego; the fact that the these two stores draw their customers from, and advertise in, a limited geographic area; and the fact that the defendants have stated that they have

no plans to open other stores under the Gigante name. If the defendants at a later date change the nature or extent of their current exploitation of the Gigante name, the Court might be inclined to find that some form of injunctive relief would be appropriate.

## CONCLUSION

For all of the reasons set forth above, the Court grants the defendants' motion for summary judgment on the plaintiffs' trademark dilution claims, and denies the defendants' motion for summary judgment on their counterclaim to cancel the plaintiffs' registration. The Court also grants, in part, the plaintiffs' motion for partial summary judgment, and declares that the plaintiffs have a valid, protectable interest in the Gigante name, arising from their renown in the San Diego area as of August 1991. However, because of the plaintiffs' unreasonable delay in asserting their rights, the Court denies the plaintiffs' request to enjoin the defendants from using the Gigante name on the defendants' two San Diego stores.

IT IS SO ORDERED.