**GRUPO GIGANTE SA DE CV; Gigante SA De CV; Gigante Holding International, Plaintiffs–counter–defendants–Appellees,**

v.

**DALLO & CO., INC.; Michael, Dallo; Rafid Dallo; Douray Dallo; Louis Dallo; Chris Dallo, Defendants,**

and

**MD & CD LLC, Defendant–Appellant,**

**Profile LLC, Defendant–counter–claimant–Appellant.**

**Grupo Gigante SA De CV; Gigante SA De CV; Gigante Holding International, Plaintiffs–counter–defendants–Appellants,**

v.

**Dallo & Co., Inc.; Michael Dallo; Rafid Dallo; Douray Dallo; Louis Dallo; Chris Dallo, Defendants,**

and

**MD & CD LLC, Defendant–Appellee,**

**Profile LLC, Defendant–counter–claimant–Appellee.**

No. 00–57118.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 6, 2002.

Submission Deferred May 9, 2002.

Resubmitted June 13, 2002.

Filed Dec. 15, 2004.

Randy M. McElvain, Weston & McElvain, Los Angeles, CA, for the appellants.

Matthew A. Hodel, Paul, Hastings, Janofsky & Walker LLP, Costa Mesa, CA, for the appellees.

Before: KLEINFELD and GRABER, Circuit Judges, and COLLINS, District Judge.*

## OPINION

KLEINFELD, Circuit Judge.

This is a trademark case. The contest is between a large Mexican grocery chain that has long used the mark, but not in the United States, and a small American chain that was the first to use the mark in the United States, but did so, long after the Mexican chain began using it, in a locality where shoppers were familiar with the Mexican mark.

### Facts

Grupo Gigante S.A. de C.V. ("Grupo Gigante") operates a large chain of grocery stores in Mexico, called "Gigante," meaning "Giant" in Spanish. Grupo Gigante first called a store "Gigante" in Mexico City in 1962. In 1963, Grupo Gigante registered the "Gigante" mark as a trade name in Mexico, and has kept its registration current ever since. The chain was quite successful, and it had expanded into Baja California, Mexico by 1987. By 1991,

Grupo Gigante had almost 100 stores in Mexico, including six in Baja, all using the mark "Gigante." Two of the Baja stores were in Tijuana, a city on the U.S.-Mexican border, just south of San Diego.

As of August 1991, Grupo Gigante had not opened any stores in the United States. That month, Michael Dallo began operating a grocery store in San Diego, using the name "Gigante Market." In October 1996, Dallo and one of his brothers, Chris Dallo, opened a second store in San Diego, also under the name Gigante Market. The Dallo brothers—who include Michael, Chris, and their two other brothers, Douray and Rafid—have since controlled the two stores through various limited liability corporations.[1]

In 1995, which was after the opening of the Dallos' first store and before the opening of their second, Grupo Gigante began exploring the possibility of expanding into Southern California. It learned of the Dallos' Gigante Market in San Diego. Grupo Gigante decided against entering the California market at that time. It did nothing about the Dallos' store despite Grupo Gigante's knowledge that the Dallos were using "Gigante" in the store's name.

In 1998, Grupo Gigante decided that the time had come to enter the Southern California market. It arranged a meeting with Michael Dallo in June 1998 to discuss the Dallos' use of the name "Gigante." Grupo Gigante was unsuccessful at this meeting in its attempt to convince Dallo to stop using the "Gigante" mark. Also in June 1998, Grupo Gigante registered the

---

* The Honorable Raner C. Collins, United States District Judge for the District of Arizona, sitting by designation.

1. Ownership of the two stores appears to have passed among several LLCs at different points. The specific ownership structure is irrelevant to the questions before us. The Dallo brothers, or some subset of them, have always controlled the various corporations, and thus we refer to the defendants collectively as "the Dallos."

"Gigante" mark with the state of California. The Dallos did likewise in July 1998. Neither has registered the mark federally.[2]

About one year later, in May 1999, Grupo Gigante opened its first U.S. store. That store was followed by a second later that year, and then by a third in 2000. All three stores were in the Los Angeles area. All were called "Gigante," like Grupo Gigante's Mexican stores.

In July 1999, after learning of the opening of Grupo Gigante's first U.S. store, the Dallos sent Grupo Gigante a cease-and-desist letter, making the same demand of Grupo Gigante that Grupo Gigante had made of them earlier: stop using the name Gigante. Grupo Gigante responded several days later by filing this lawsuit. Its claim was based on numerous federal and state theories, including trademark infringement under the Lanham Act.[3] It sought compensatory and punitive damages, a declaratory judgment that it had the superior right to the Gigante mark, and an injunction against the Dallos' use of the mark. The Dallos counterclaimed, on similar theories, asserting it had the superior right to the mark in Southern California.[4] The Dallos sought a declaratory judgment, injunctive relief, damages, and cancellation of Grupo Gigante's California registration of the mark.

The district court disposed of the case in a published decision on cross motions for summary judgment.[5] The court recognized that under the "territoriality principle," use of a mark in another country generally does not serve to give the user trademark rights in the United States. Thus, the territoriality principle suggests that the Dallos' use of the mark, which was the first in the United States, would entitle them to claim the mark. But it held that because Grupo Gigante had already made Gigante a well-known mark in Southern California by the time the Dallos began using it, an exception to the territoriality principle applied. As the district court interpreted what is known as the "famous-mark" or "well-known mark" exception to the territoriality principle, Grupo Gigante's earlier use in Mexico was sufficient to give it the superior claim to the mark in Southern California. The court held, therefore, that Grupo Gigante was entitled to a declaratory judgment that it had a valid, protectable interest in the Gigante name. Nevertheless, the court held that laches barred Grupo Gigante from enjoining the Dallos from using the mark at their two existing stores.[6] The Dallos appeal the

---

**2.** *See generally* 15 U.S.C. § 1051 *et seq.*

**3.** Specifically, Grupo Gigante asserted the following causes of action: (1) improper use of a well-known mark, under Article 6 *bis* of the Paris Convention; (2) unfair competition, under Article 10 *bis* of the Paris Convention; (3) trademark infringement, under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (4) false designation of origin, misrepresentation, and unfair competition, under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (5) violation of the Federal Trademark Dilution Act of 1996, 15 U.S.C. § 1125(c); (6) common law unfair competition; (7) unfair competition under California law; (8) dilution under California law; and (9) common law misappropriation.

**4.** The Dallos asserted the following causes of action: (1) trademark infringement, under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) false designation of origin, misrepresentation, and unfair competition, under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) common law unfair competition; (4) trademark infringement and unfair competition under California law; (5) dilution under California law; and (6) common law misappropriation.

**5.** *Grupo Gigante S.A. de C.V. v. Dallo & Co., Inc.,* 119 F.Supp.2d 1083 (C.D.Cal.2000).

**6.** In earlier rulings and in its published order, the district court made other holdings as well that addressed the parties' various claims. As

holding that Grupo Gigante has a protectable right to use the mark in Southern California. Grupo Gigante appeals the laches holding. We agree in large part with the district court's excellent opinion, but some necessary qualifications to it require a remand.

## Analysis

### The exception for famous and well-known foreign marks

We review the summary judgment decision de novo.[7]

A fundamental principle of trademark law is first in time equals first in right. But things get more complicated when to time we add considerations of place, as when one user is first in time in one place while another is first in time in a different place. The complexity swells when the two places are two different countries, as in the case at bar.

Under the principle of first in time equals first in right, priority ordinarily comes with earlier *use* of a mark in commerce. It is "not enough to have invented the mark first or even to have registered it first."[8] If the first-in-time principle were all that mattered, this case would end there. It is undisputed that Grupo Gigante used the mark in commerce for decades before the Dallos did. But the facts of this case implicate another well-established principle of trademark law, the

explained below, we need not reach those holdings here.

7. *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1257 (9th Cir.2001).

8. *Sengoku Works Ltd. v. RMC Int'l, Ltd.,* 96 F.3d 1217, 1219 (9th Cir.1996); *see Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1047 (9th Cir. 1999).

"territoriality principle." The territoriality principle, as stated in a treatise, says that "[p]riority of trademark rights in the United States depends solely upon priority of use in the United States, not on priority of use anywhere in the world."[9] Earlier use in another country usually just does not count.[10] Although we have not had occasion to address this principle, it has been described by our sister circuits as "basic to trademark law," in large part because "trademark rights exist in each country solely according to that country's statutory scheme."[11] While Grupo Gigante used the mark for decades before the Dallos used it, Grupo Gigante's use was in Mexico, not in the United States. Within the San Diego area, on the northern side of the border, the Dallos were the first users of the "Gigante" mark. Thus, according to the territoriality principle, the Dallos' rights to use the mark would trump Grupo Gigante's.

Grupo Gigante does not contest the existence of the territoriality principle. But like the first-in-time, first-in-right principle, it is not absolute. The exception, as Grupo Gigante presents it, is that when foreign use of a mark achieves a certain level of fame for that mark within the United States, the territoriality principle no longer serves to deny priority to the earlier foreign user. The Dallos concede that there is such an exception, but dispute what it takes for a mark to qualify for it. Grupo Gigante would interpret the excep-

9. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 29:2, at 29–6 (4th ed.2002) (internal footnote omitted).

10. *See Person's Co., Ltd. v. Christman,* 900 F.2d 1565, 1569–70 (Fed.Cir.1990); *Buti v. Perosa, S.R.L.,* 139 F.3d 98, 103–05 (2d Cir. 1998); *Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha,* 754 F.2d 591, 599 (5th Cir.1985).

11. *Fuji Photo,* 754 F.2d at 599; *see also Person's,* 900 F.2d at 1569.

tion broadly, while the Dallos would interpret it narrowly.

Grupo Gigante does not argue to this court that it used the mark *in the United States* in a way that qualifies for protection regardless of the territoriality principle and any exception to it. While the district court opinion suggests that Grupo Gigante made an alternative argument of this sort below,[12] its argument on appeal is limited to whether the mark has become well-known enough to overcome the territoriality principle. For example, while the statement of facts in Grupo Gigante's brief claims that Grupo Gigante engaged in advertising in Mexico that reached United States consumers, Grupo Gigante does not assert that this advertising, combined with other activities, constitutes domestic use of the mark.[13] Thus, while Grupo Gigante does not appear to concede explicitly that application of the famous-mark exception is necessary to its success on appeal, the structure of its argument suggests as much. Since the district court based its holding on an interpretation of the exception, and since Grupo Gigante does not urge us to consider alternative ways it might be eligible for protection, we have no occasion to decide, and do not decide, whether Grupo Gigante could establish protection for its mark apart from application of the famous-mark exception to the territoriality principle.

■ There is no circuit-court authority—from this or any other circuit—applying a famous-mark exception to the territoriality principle. At least one circuit judge

has, in a dissent, called into question whether there actually is any meaningful famous-mark exception.[14] We hold, however, that there is a famous mark exception to the territoriality principle. While the territoriality principle is a long-standing and important doctrine within trademark law, it cannot be absolute. An absolute territoriality rule without a famous-mark exception would promote consumer confusion and fraud. Commerce crosses borders. In this nation of immigrants, so do people. Trademark is, at its core, about protecting against consumer confusion and "palming off." [15] There can be no justification for using trademark law to fool immigrants into thinking that they are buying from the store they liked back home.

It might not matter if someone visiting Fairbanks, Alaska from Wellington, New Zealand saw a cute hair-salon name— "Hair Today, Gone Tomorrow," "Mane Place," "Hair on Earth," "Mary's Hair'em," or "Shear Heaven"—and decided to use the name on her own salon back home in New Zealand. The ladies in New Zealand would not likely think they were going to a branch of a Fairbanks hair salon. But if someone opened a high-end salon with a red door in Wellington and called it Elizabeth Arden's, women might very well go there because they thought they were going to an affiliate of the Elizabeth Arden chain, even if there had not been any other Elizabeth Ardens in New Zealand prior to the salon's opening. If it was not an affiliate, just a local store with

---

**12.** *See Grupo Gigante,* 119 F.Supp.2d at 1089 n. 5.

**13.** *See, e.g., Int'l Bancorp, LLC v. Societe des Bains de Mer,* 329 F.3d 359, 370 (4th Cir. 2003).

**14.** *Int'l Bancorp,* 329 F.3d at 389 n. 9 (Motz, J., dissenting) ("Nor does the 'famous marks'

doctrine provide SBM any refuge. That doctrine has been applied so seldom (never by a federal appellate court and only by a handful of district courts) that its viability is uncertain.").

**15.** *See Thane Int'l, Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 901 (9th Cir.2002).

no connection, customers would be fooled. The real Elizabeth Arden chain might lose business if word spread that the Wellington salon was nothing special.

The most cited case for the famous-mark exception is *Vaudable v. Montmartre, Inc.*, a 1959 trial court decision from New York.[16] A New York restaurant had opened under the name "Maxim's," the same name as the well-known Parisian restaurant in operation since 1893, and still in operation today. The New York Maxim's used similar typography for its sign, as well as other features likely to evoke the Paris Maxim's—particularly among what the court called "the class of people residing in the cosmopolitan city of New York who dine out"[17] (by which it apparently meant the sort of people who spend for dinner what some people spend for a month's rent). The court enjoined the New York use, even though the Paris restaurant did not operate in New York, or in the United States, because the Maxim's mark was "famous."[18]

While *Vaudable* stands for the principle that even those who use marks in other countries can sometimes—when their marks are famous enough—gain exclusive rights to the marks in this country, the case itself tells us little about just how famous or well-known the foreign mark must be. The opinion states in rather conclusory terms that the Paris Maxim's "is, of course, well known in this country," and that "[t]here is *no doubt* as to its unique and eminent position as a restaurant of international fame and prestige."[19] This language suggests that Maxim's had achieved quite a high degree of fame here, and certainly enough to qualify for the exception to the territoriality principle, but it suggests nothing about just how much fame was necessary. It does not suggest where the line is between "Shear Heaven" and Maxim's.

The Patent and Trademark Office's Trademark Trial and Appeal Board, whose expertise we respect and whose decisions create expectations, has recognized the validity of the famous-mark exception.[20] But as with *Vaudable*, none of these cases helps us to establish a clear threshold for just how famous a mark must be to qualify for the exception.

■ Grupo Gigante urges us to adopt the approach the district court took. The district court held that the correct inquiry was to determine whether the mark had attained secondary meaning in the San Diego area. Secondary meaning refers to a mark's actual ability to trigger in consumers' minds a link between a product or service and the source of that product or service. That is, a mark has secondary meaning "when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself."[21] Determining whether a mark has secondary meaning requires taking into account at least seven considerations, which the district court did

**16.** *Vaudable v. Montmartre, Inc.*, 20 Misc.2d 757, 193 N.Y.S.2d 332 (N.Y.Sup.Ct.1959).

**17.** *Id.* at 334.

**18.** *Id.* at 335.

**19.** *Id.* at 334 (emphasis added).

**20.** *See, e.g., The All England Lawn Tennis Club (Wimbledon) Ltd. v. Creations Aromatiques, Inc.*, 220 U.S.P.Q. 1069, 1072, 1983 WL 51903 (T.T.A.B.1983); *Mother's Rests. Inc. v. Mother's Other Kitchen, Inc.*, 218 U.S.P.Q. 1046, 1048, 1983 WL 51992 (T.T.A.B.1983).

**21.** *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) (internal quotation and editing omitted).

in this case.[22]

Applying its interpretation of the famous-mark exception, the district court concluded that Grupo Gigante's use of the mark had achieved secondary meaning in the San Diego area by the time the Dallos opened their first store, and thus the court held that Grupo Gigante's use was eligible for the exception to the territoriality principle. Grupo Gigante asserts that we, too, should adopt secondary meaning as the definition of the exception. We decline to go quite this far, however, because following the district court's lead would effectively cause the exception to eclipse the territoriality rule entirely.

■ Secondary meaning has two functions. First, it serves to determine whether certain marks are distinctive enough to warrant protection. Some marks—those that are arbitrary, fanciful, or suggestive— are deemed inherently distinctive.[23] Others—including those that are descriptive of some feature of the products or services to which they are attached—require some indication of distinctiveness before trademark protection is available. That required indication is that the mark have

acquired secondary meaning.[24] Thus, before Grupo Gigante (or for that matter the Dallos) could have a protectable interest in "Gigante" at all, Grupo Gigante would have to show that the mark has acquired secondary meaning by demonstrating that it has come to identify to consumers Grupo Gigante's particular brand of store, not merely a characteristic of Grupo Gigante's stores and others like them.

■ Second, and most relevant to this case, secondary meaning defines the geographic area in which a user has priority, regardless of who uses the mark first. Under what has become known as the *Tea Rose–Rectanus* doctrine, priority of use in one geographic area within the United States does not necessarily suffice to establish priority in another area.[25] Thus, the first user of a mark will not necessarily be able to stop a subsequent user, where the subsequent user is in an area of the country "remote" from the first user's area.[26] The practical effect is that one user may have priority in one area, while another user has priority over the very same mark in a different area.[27] The point

---

**22.** *See Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143 (9th Cir. 1999).

**23.** *See Wal–Mart*, 529 U.S. at 210–11, 120 S.Ct. 1339.

**24.** *See Wal–Mart Stores*, 529 U.S. at 210–11, 120 S.Ct. 1339.

**25.** The name of the doctrine comes from a pair of early twentieth-century Supreme Court cases, *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916) (the *"Tea Rose"* case), and *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918).

**26.** Good faith may also be an issue in such cases. *See Hanover Star*, 240 U.S. at 415, 36 S.Ct. 357 (excepting from the general *Tea Rose–Rectanus* principle cases in which "the second adopter has selected the mark with

some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like."). Good faith is not raised in this appeal (perhaps because the appeal comes up on summary judgment) and is irrelevant to our analysis.

**27.** *See Rectanus*, 248 U.S. at 100, 39 S.Ct. 48 ("Undoubtedly, the general rule is that, as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question.... The reason for the rule does not extend to a case where the same trademark happens to be employed simultaneously by two manufacturers in different markets separate and remote from each other, so that the mark means one thing in one market, and entirely different thing in another.")

of this doctrine is that in the remote area, where no one is likely to know of the earlier user, it is unlikely that consumers would be confused by the second user's use of the mark.[28] Secondary meaning comes into play in determining just how far each user's priority extends. Courts ask whether the first, geographically limited use of the mark is well-known enough that it has gained secondary meaning not just within the area where it has been used, but also within the remote area, which is usually the area where a subsequent user is claiming the right to use the mark.[29]

Assume, for example, that Grupo Gigante had been using the mark in Arizona as well as in various parts of Mexico, and that it had met all the other requirements of having a protectable interest in the mark, including having established secondary meaning throughout Arizona. If the Dallos later began using the same mark in San Diego without knowledge of Grupo Gigante's earlier "remote" use in Arizona, whether Grupo Gigante could stop them would depend on what the mark meant to consumers in San Diego. Under the *Tea Rose–Rectanus* doctrine, Grupo Gigante would have priority in San Diego, and thus be able to stop the Dallos' use of the mark, only if the secondary meaning from Grupo Gigante's use of the mark in Arizona extended to San Diego as well. If, on the other hand, the secondary meaning from Grupo Gigante's use were limited to Arizona, then the Dallos might be free to continue using the mark in San Diego.

Thus, if the dispute before us were between a Mexican and Arizonan Grupo Gigante on the one hand, and the Dallos on the other, we would analyze, under the *Tea Rose–Rectanus* doctrine, whether Grupo Gigante's use of the mark had achieved secondary meaning in San Diego. This is how the district court analyzed the actual dispute, as a result of having defined the exception to the territoriality principle in terms of secondary meaning. In other words, the district court treated Grupo Gigante's use of the mark exactly as it would have had Grupo Gigante used the mark not only in Mexico, but also in another part of the United States. Under the district court's interpretation of the exception to the territoriality principle, the fact that Grupo Gigante's earlier use of the mark was entirely outside of the United States becomes irrelevant.

The problem with this is that treating international use differently is what the territoriality principle does. This interpretation of the exception would effectively eliminate the territoriality principle by eliminating any effect of international borders on protectability. We would end up treating foreign uses of the mark just as we treat domestic uses under the *Tea Rose–Rectanus* doctrine, asking in both cases whether the use elsewhere resulted in secondary meaning in the local market.

We would go too far if we did away with the territoriality principle altogether by expanding the famous-mark exception this much. The territoriality principle has a long history in the common law,[30] and at

28. *See id.*

29. *See, e.g., id.* at 103, 39 S.Ct. 48; *Hanover Star*, 240 U.S. at 415, 36 S.Ct. 357; *Adray v. AdryMart, Inc.*, 76 F.3d 984, 987–88 (9th Cir. 1996).

30. As McCarthy has noted, traces of the territoriality principle appear in Justice Holmes's

opinion for the U.S. Supreme Court in *A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 692, 43 S.Ct. 244, 67 L.Ed. 464 (1923). McCarthy, *supra*, at § 29:1, p. 29–4; *see also Philip Morris Inc. v. Allen Distribs., Inc.*, 48 F.Supp.2d 844, 850 (S.D.Ind.1999) (identifying *Bourjois* as marking the shift from "the 'universality' principle [to] a 'territoriality principle' that recognizes a separate legal existence for a

least two circuits have described it as "basic to trademark law."[31] That status reflects the lack of a uniform trademark regime across international borders. What one must do to acquire trademark rights in one country will not always be the same as what one must do in another. And once acquired, trademark rights gained in other countries are governed by each country's own set of laws.[32] Furthermore, we are arguably required by the Paris Convention, of which the United States is a signatory, to preserve the territoriality principle in some form.[33] Thus, we reject Grupo Gigante's argument that we should define the well-known mark exception as merely an inquiry into whether the mark has achieved secondary meaning in the area where the foreign user wishes to assert protection.

■ To determine whether the famous-mark exception to the territoriality rule applies, the district court must determine whether the mark satisfies the secondary meaning test. The district court determined that it did in this case, and we agree with its persuasive analysis. But secondary meaning is not enough.

■ In addition, where the mark has not before been used in the American market, the court must be satisfied, by a preponderance of the evidence, that a *substantial* percentage of consumers in the

relevant American market is familiar with the foreign mark. The relevant American market is the geographic area where the defendant uses the alleged infringing mark. In making this determination, the court should consider such factors as the intentional copying of the mark by the defendant, and whether customers of the American firm are likely to think they are patronizing the same firm that uses the mark in another country. While these factors are not necessarily determinative, they are particularly relevant because they bear heavily on the risks of consumer confusion and fraud, which are the reasons for having a famous-mark exception.

Because the district court did not have the benefit of this additional test, we vacate and remand so that it may be applied. We intimate no judgment on whether further motion practice and some additions to what the district court has already written in its published opinion will suffice, or whether trial will be needed to apply this new test. Nor do we intimate what the result should be. The concurring opinion is incorrect in its suggestion that the case necessarily must go to trial because distinctiveness of a mark is a question of fact and defendants have contested the reliability of plaintiffs' survey evidence. That conclusion flies in the face of the 1986 triumvirate of summary judgment cases.[34]

---

trademark in each country whose laws afford protection to the mark").

**31.** *Fuji Photo,* 754 F.2d at 599; *Person's,* 900 F.2d at 1569.

**32.** *See Ingenohl v. Walter E. Olsen & Co., Inc.,* 273 U.S. 541, 544, 47 S.Ct. 451, 71 L.Ed. 762 (1927) ("A trademark started elsewhere would depend for its protection in Hongkong upon the law prevailing in Hongkong and would confer no rights except by the consent of that law."); *Fuji Photo,* 754 F.2d at 599 ("[T]rademark rights exist in each country solely according to that country's statutory scheme.").

**33.** *Paris Convention for the Protection of Industrial Property,* Mar. 20, 1883, as revised at Stockholm, July 14, 1967, art. 6(3), 21 U.S.T. 1583, § 6(3) ("A mark duly registered in a country of the Union shall be regarded as independent of marks registered in the other countries of the Union, including the country of origin.").

**34.** *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475

Regardless of whether questions are factual, there is nothing to try unless there is a genuine issue of material fact. One survey that is impeachable, but still good enough to get to a jury, weighed against no survey evidence at all on the other side, along with all the other evidence in the record, does not necessarily add up to a genuine issue of fact.

### Paris Convention claims

■ The district court properly held that Grupo Gigante's claim for "use of a well-known mark" under Article 6 *bis* of the Paris Convention is duplicative of its claim that, because the Gigante mark is well-known, that mark is entitled to protection under the Lanham Act. The district court also properly rejected Grupo Gigante's claim for unfair competition under Article 10 *bis* of the Paris Convention.

There has been some understandable confusion among the district courts with respect to whether the Paris Convention, implemented in § 44 of the Lanham Act, creates substantive law or a right of action applicable to international trademark disputes. *Compare Mattel, Inc. v. MCA Records, Inc.*, 28 F.Supp.2d 1120, 1158 (C.D.Cal.1998) (holding that the Paris Convention does not create a right of action separate and distinct from those available under the Lanham Act), *with Maison Lazard et Compagnie v. Manfra, Tordella & Brooks, Inc.*, 585 F.Supp. 1286, 1289 (S.D.N.Y.1984) (holding that the Paris Convention creates a distinct cause of action for unfair competition). That confusion results from the interplay between Article 10 *bis* and § 44 of the Lanham Act. As discussed above, Article 10 *bis* requires member countries "to assure to nationals of [other member countries] effective protection against unfair competition." Paris Convention, art. 10 *bis*, 21 U.S.T. at 1648. Section 44 of the Lanham Act implements Article 10 *bis* by extending Lanham Act protection to foreign nationals to the extent necessary to satisfy the United States' treaty obligations:

> Any person whose country of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party, or extends reciprocal rights to nationals of the United States by law, shall be entitled to the benefits of this section under the conditions expressed herein to the extent necessary to give effect to any provision of such convention, treaty or reciprocal law, in addition to the rights to which any owner of a mark is otherwise entitled by this chapter.

15 U.S.C. § 1126(b).[35]

Grupo Gigante uses the phrase "in addition to the rights to which any owner of a mark is otherwise entitled to by this chapter" to argue that § 44 of the Lanham Act implements certain additional substantive rights created by international treaties. Although that may be true as a general matter, Article 10 *bis* itself does not create additional substantive rights. Rather, "[t]he Paris Convention ensures that 'foreign nationals should be given the same treatment in each of the member countries as that country makes available to its own citizens' as to trademark and related rights." *Int'l Café, S.A.L. v. Hard Rock Café Int'l, Inc.*, 252 F.3d 1274, 1277 (11th Cir.2001) (quoting *Vanity Fair Mills, Inc.*

U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**35.** Section 44(h) of the Lanham Act similarly "creates a federal right that is coextensive with the substantive provisions of the treaty involved." *Mattel*, 296 F.3d at 907.

*v. T. Eaton Co.*, 234 F.2d 633, 640 (2d Cir.1956)).

As we held in *Kemart Corp. v. Printing Arts Research Laboratories, Inc.*, 269 F.2d 375, 389 (9th Cir.1959), "the Paris Convention was not intended to define the substantive law in the area of 'unfair competition' of the signatory countries." More recently, we concluded that the interaction between § 44 of the Lanham Act and Article 10 *bis* of the Paris Convention simply results in equal treatment of foreign and domestic parties in trademark disputes:

> A foreign national is entitled to the same "effective protection against unfair competition" to which an American is entitled, Paris Convention, art. 10b is, and in turn, the American gets the same right that the foreign national gets.... But [a party] has no claim to a nonexistent federal cause of action for unfair competition. As said, the Paris Convention provides for national treatment, and does not define the substantive law of unfair competition.

*Mattel*, 296 F.3d at 908. *See also Int'l Café*, 252 F.3d at 1278 (holding that the Paris Convention "only requires 'national treatment' ").

Because the Paris Convention creates neither a federal cause of action nor additional substantive rights, the district court properly dismissed Grupo Gigante's Paris Convention claims.

### Priority based on California law

▪ Grupo Gigante next argues that, even if it failed to establish that the Gigante mark is famous and well-known, it has established priority under California law because California does not recognize

the territoriality principle and, consequently, use anywhere in the world suffices to establish priority in California. Grupo Gigante draws support for this argument principally from *Derringer v. Plate*, 29 Cal. 292 (1865). *Derringer* held that, under common law trademark principles, "the person who has first adopted and used a trademark, whether within or beyond the limits of this State, shall be considered its original owner, with full right of property, and entitled to the same protection by suits at law as in the case of other personal property." *Id.* at 297 (internal quotation marks omitted).[36] In arguing that *Derringer* contemplated use in other countries as a means to establish priority in California, Grupo Gigante points out that the California Supreme Court rejected the contention that "all the merchants and manufacturers ... in every country that maintains commercial relations with California, if they desired to be considered in this State, the owners of their marks" must comply with state filing requirements. *Id.* at 298.

▪ As a general matter, trademark claims under California law are "substantially congruent" with federal claims and thus lend themselves to the same analysis. *Playboy Enters. Inc.*, 354 F.3d at 1024 n. 10. Even looking exclusively to California case law, no case supports Grupo Gigante's contention that California disregards the territoriality principle. *Derringer* involved a dispute between a California defendant and a plaintiff doing business in Philadelphia. Thus, any comment in *Derringer* with respect to foreign parties was dictum. Further, *Derringer* discusses foreign parties in the limited context of compliance with California's statutory filing proce-

---

**36.** The Dallos correctly note that the court in *Derringer* was interpreting a state statute, California Business and Professions Code § 14400 that has since been repealed. Because that statute was "an affirmance of the common law," however, Grupo Gigante's argument that *Derringer* is still instructive with respect to the contemporary California common law of trademark infringement and unfair competition is persuasive. 29 Cal. at 297.

dures. There is no justification in *Derringer* or later cases for reading that limited discussion as a flat rejection of the territoriality principle.

The later cases that Grupo Gigante offers as proof of *Derringer's* continued vitality are similarly limited to disputes between domestic parties. For example, *Stork Restaurant v. Sahati*, 166 F.2d 348 (9th Cir.1948), involved a suit between two establishments named the "Stork club," one in New York and one in San Francisco. Both parties in *Golden Door v. Odisho*, 646 F.2d 347 (9th Cir.1980), conducted business in California. At most, these cases establish that California recognizes the *Tea Rose–Rectanus* doctrine. They provide no support for the conclusion that use anywhere in the world suffices to establish priority in California. Thus, Grupo Gigante's state law claims must fail.

### Laches

Additionally, Grupo Gigante argues that the district court erred in holding that its four-year delay in bringing suit bars their claim for injunctive relief.

### A. Standard of Review

■ At the outset, the parties dispute the appropriate standard of review that applies to a district court's conclusion, on summary judgment, that laches bars a claim for injunctive relief in an action for trademark infringement. Our precedents are in some tension on this issue. In *Jackson v. Axton*, 25 F.3d 884 (9th Cir. 1994), *overruled on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), we observed that "[t]his court has reviewed a grant of summary judgment on grounds of laches both de novo and for abuse of discretion." *Id.* at 888. In *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 833–34 (9th Cir.2002), we explained

that the proper standard of review is something of a hybrid, with certain aspects of the district court's laches determination being reviewed de novo and others being reviewed for either abuse of discretion or clear error:

> For example, we review de novo whether the district court inappropriately resolved any disputed material facts in reaching its decision. We also review de novo whether laches is a valid defense to the particular cause of action. However, the district court's application of the laches factors is entitled to deference, not to be reviewed de novo.

(Citations omitted); *see also Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1009 (9th Cir.2004) (reviewing a district court's laches determination for abuse of discretion).

■ *Jarrow Formulas* left undecided the issue of whether a district court's application of the laches factors is reviewed under the clearly erroneous or abuse of discretion standard. *Id.* at 834. As in *Jarrow Formulas*, the difference between those standards is not outcome determinative here. "An abuse of discretion occurs if the district court bases its decision on an erroneous legal standard or on clearly erroneous findings of facts." *Coalition for Econ. Equity v. Wilson*, 122 F.3d 692, 701 (9th Cir.1997) (internal quotation marks omitted). Because the district court neither committed clear error nor abused its discretion in applying the laches factors to the present case, there is no reason to resolve the narrow issue that *Jarrow Formulas* left open.

### B. Application of the E–Systems factors

■ In *E–Systems Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir.1983), we set out six factors for determining whether laches bars a claim for either damages or

injunctive relief in an action for trademark infringement:

1. strength and value of trademark rights asserted;

2. plaintiff's diligence in enforcing mark;

3. harm to senior user if relief denied;

4. good faith ignorance by junior user;

5. competition between senior and junior users; and

6. extent of harm suffered by junior user because of senior user's delay.

### 1. Strength and value of the trademark rights asserted

■ The district court properly concluded that Gigante is either a descriptive or a suggestive mark when used to identify a large grocery store with a wide selection of general merchandise. *Grupo Gigante,* 119 F.Supp.2d at 1096. Descriptive or suggestive marks are relatively weak. *Accuride Int'l, Inc. v. Accuride Corp.,* 871 F.2d 1531, 1536 (9th Cir.1989).

Grupo Gigante argues that the Gigante trademark is stronger than a typical descriptive or suggestive mark because its uncontroverted expert survey established that the mark has acquired secondary meaning. As explained above, the probative value of that evidence is highly questionable. Nonetheless, even granting that the mark has achieved some appreciable level of secondary meaning, the district court's conclusion that the Gigante mark is "moderately strong" took that acquired meaning into account. *Grupo Gigante,* 119 F.Supp.2d at 1104.

### 2. The plaintiff's diligence in enforcing the mark

The undisputed facts establish that Grupo Gigante first learned of the Dallos' Gigante Market in mid–1995. Grupo Gi-

gante did not contact the Dallos regarding the allegedly infringing use of the mark until June 1998. After Grupo Gigante's Director of Operations accused the Dallos of intentionally adopting the Gigante mark with the knowledge of Grupo Gigante's competing use, the Dallos terminated the meeting. Although the Dallos clearly did not intend to stop using the Gigante name, Grupo Gigante took no further action. After Grupo Gigante opened its first Gigante store in the Dallos' trading area, *the Dallos* sent a cease-and-desist letter to Grupo Gigante. That letter prompted Grupo Gigante to bring suit two weeks later, in July 1999.

■ Grupo Gigante offers three explanations for its four-year delay in bringing suit. First, Grupo Gigante explains that it originally tried to contact the Dallos through a mutual vendor, Fleming Foods, in 1997, but that Fleming was reluctant to set up the meeting before seeking approval from its legal department. Grupo Gigante's attempt to assign responsibility for the delay to Fleming is unpersuasive. "Companies expecting judicial enforcement of their marks must conduct an *effective* policing effort." *Am. Int'l Group, Inc. v. Am. Int'l Bank,* 926 F.2d 829, 834 (9th Cir.1991) (Kozinski, J., dissenting) (emphasis added). At the very least, that effort must involve actually contacting the alleged infringer about its use of a trademark.

Second, Grupo Gigante points out that the Dallos' first Gigante Market operated at a loss between 1995 and 1998. That argument is equally unavailing. To be sure, a plaintiff may be "justified in delaying a protest or the commencement of litigation until the viability of the defendant's infringing business is evident." Restatement (Third) of Unfair Competition, § 31, cmt. c (1995). The other side of that coin, however, is that the plaintiff "cannot

simply wait without explanation to see how successful the defendant's business will be and then ask for an injunction to take away good will developed by defendant in the interim." 5 *McCarthy* § 31:14, at 31–50.

Here, although the Dallos operated their first Gigante Market at a loss for three years, they opened a second Gigante Market a year after Grupo Gigante first learned of the alleged infringement. Further, it is unclear from the record whether Grupo Gigante learned that the Dallos' first Gigante Market was operating in the red until discovery commenced in this case. Even if Grupo Gigante had the benefit of that knowledge before this litigation started, that knowledge alone does not excuse its delay in view of the fact that the Dallos opened an additional store under the same name.

Finally, Grupo Gigante argues that the dispute did not "crystalize" until it opened their first U.S. grocery store in May 1999. Because only then did the "likelihood of confusion loom large," Grupo Gigante contends, it had no obligation to bring suit before moving into the Dallos' market. That argument rings hollow in the light of Grupo Gigante's argument that its mark already was well known in San Diego County in 1991. Grupo Gigante cannot logically argue that it had established a protectable interest in the Gigante mark in the Dallos' trading area in 1991, but was not obliged to protect that interest until 1999.

By the same token, Grupo Gigante's "progressive encroachment" argument is unpersuasive. As we have noted, laches cannot bar injunctive relief when an infringing user progressively encroaches on the owner's mark over time. *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp.*

*of Cal.;* 694 F.2d 1150, 1154 (9th Cir.1983) (stating that "if the junior user of a mark moves into direct competition with the senior user, selling the same 'product' through the same channels and causing actual market confusion, laches is no defense"). A defendant can encroach on a plaintiff's mark by expanding its business into different regions or into different markets. *Id.* The doctrine allows a plaintiff to delay when a defendant engages in de minimis infringement at first, but then gradually encroaches on the plaintiff's market. *See E–Systems, Inc.*, 720 F.2d at 607 ("Had defendant's encroachment been minimal, or its growth slow and steady, there would be no laches.").

Here, however, *Grupo Gigante* is encroaching on *the Dallos'* market. The Dallos' use of the Gigante mark has not changed since 1996: they operate two grocery stores in San Diego. The district court's implicit rejection of Grupo Gigante's "progressive encroachment" argument, and its conclusion that Grupo Gigante "ha[s] not been diligent in enforcing [its] mark," were proper. *Grupo Gigante,* 119 F.Supp.2d at 1105.

### 3. Harm to senior user if relief denied

Noting that "[t]he parties have co-existed on both sides of the United States–Mexico border for almost ten years," the district court concluded that there was "no threat of great harm to the plaintiffs if the status quo were to be maintained." *Grupo Gigante,* 119 F.Supp.2d at 1105. The district court warned, however, that if the Dallos changed the nature or extent of their operations under the Gigante name, some form of injunctive relief may be appropriate later. *Id.*

The record contains some evidence of actual confusion.[37] Grupo Gigante further

37. Specifically, Grupo Gigante note that some

customers have attempted to use discount

argues that the likelihood of confusion was so strong as to be inevitable, thus excusing any delay. *See Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 463 (4th Cir.1996) (holding that laches is not to be "rigidly applied" when the likelihood of confusion is apparent). At the same time, Grupo Gigante concedes that it did not suffer actual harm as a result of the Dallos' alleged infringement until it opened its first United Store stores in 1999. Further, delay weakens a claim of likelihood of confusion, because the public may learn to distinguish between similar marks over time, so that any real likelihood of confusion gradually dissipates. 5 *McCarthy* § 31:11, at 31–38 to 31–39.

■■■■ Grupo Gigante's demonstration of some instances of actual confusion make this factor a close one. However, establishing a likelihood of confusion does not automatically defeat a laches defense. In *E–Systems*, we held that laches barred injunctive relief notwithstanding our acknowledgment that some confusion was likely. 720 F.2d at 607.

Here, the district court qualified its conclusion that the harm to Grupo Gigante did not bar a laches defense by noting that, should the Dallos expand their use of the Gigante mark, the court would revisit the issue. *Grupo Gigante*, 119 F.Supp.2d at 1106. In so doing, the district court struck a sensible balance between the potential harm to Grupo Gigante, the interest in protecting the public from confusingly similar marks, and the Dallos' interest in maintaining the nine years of goodwill associated with its trademark.

**4. Good faith ignorance by junior user**

As the district court noted, *id.* at 1105, the record contains no evidence that the

Dallos acted in bad faith or had knowledge of Grupo Gigante's Mexican stores before opening their first Gigante Market in 1991. Although the Dallos had heard of Grupo Gigante's stores by the time they opened their second Gigante Market in 1996, they had already been operating under that name for five years by that time. Grupo Gigante contends that because the Dallos sought out a "Spanish sounding" name to attract customers in a predominantly Hispanic neighborhood, "any claim by appellants that their adoption of the 'Gigante' mark was made in good faith, is dubious at best." Seeking to attract customers does not constitute bad faith and Grupo Gigante offers little else to support its claim of bad faith. In the light of the absence of any relevant evidence to support that claim, the district court properly concluded that the Dallos acted in good faith.

**5. Competition between senior and junior users**

The district court concluded that no evidence suggests that the Dallos' stores compete with Grupo Gigante's Los Angeles stores. *Id.* Although noting that the Dallos might compete for customers with Grupo Gigante's Tijuana stores, the district court observed that the stores had "managed to co-exist" for over ten years. *Id.* However peaceful that co-existence may have been, the fact remains that the stores do compete. They both sell groceries to a very broad customer base in close proximity to one another. Thus, this factor weighs in Grupo Gigante's favor, particularly in view of its status as the non-moving party opposing the Dallos' motion for summary judgment.

cards issued by its Mexico stores at the Dallos' stores and that, *after* Grupo Gigante opened its first United States Gigante store,

some vendors made deliveries to the wrong locations.

### 6. Harm suffered by the defendant because of the plaintiff's delay

Had Grupo Gigante brought suit upon learning of the Dallos' allegedly infringing use, the Dallos would have had to change the name of one store that had been open for four years. Instead, the Dallos opened a second store a year after Grupo Gigante learned of its use of the Gigante name and, by the time Grupo Gigante filed suit in response to the Dallos' cease-and-desist letter, the Dallos had been operating under the Gigante name for more than eight years. Grupo Gigante argues that the Dallos are unable to show that they were harmed by Grupo Gigante's delay because the Dallos have failed to present their own evidence of secondary meaning and because they operate other grocery stores under different names.

We have held that prejudice to the defendant is an essential element of any laches defense. *Nissan Motor*, 378 F.3d at 1009; *Whitman v. Walt Disney Prods., Inc.*, 263 F.2d 229, 231 (9th Cir.1958). However, a defendant can make the required showing of prejudice by proving that it has continued to build a valuable business around its trademark during the time that the plaintiff delayed the exercise of its legal rights. 5 *McCarthy* § 31:12, at 31–42 & n. 4. By opening a second Gigante Market after Grupo Gigante learned of the Dallos' alleged infringement, and by operating both stores for an additional four years after that use was discovered, the Dallos were prejudiced by Grupo Gigante's delay. The district court did not abuse its discretion by deciding this factor in the Dallos' favor.

One factor, competition between the parties, weighs heavily in Grupo Gigante's favor. The district court's conclusion to the contrary does not justify disturbing the grant of summary judgment in favor of the Dallos. On balance, the *E–Systems* factors weigh in the Dallos' favor. The grant of summary judgment must be upheld.

### The Dallos' Cancellation–of–Registration Claim

Under California Business & Profession Code § 14281, the Secretary of State must cancel a trademark or service mark registration upon a determination that the registration was fraudulently obtained. Grupo Gigante's registrations state that the Gigante trademark and service mark were "first used" in California "as early as 1/14/98," although Grupo Gigante did not open its first Gigante store in California until 1999. The district court concluded that those statements were not false and that, even if the statements were false, the Dallos failed to produce evidence showing an intent to deceive. The district court thus denied the Dallos' motion for summary judgment on their cancellation claim. *Grupo Gigante,* 119 F.Supp.2d at 1103.

Before Grupo Gigante filed its application for state trademark registration, it had offered stock in the United States, conducted promotional activities at Sea World and Universal Studios in California, operated an office and a warehouse facility in San Diego, and imported and distributed wholesale goods under the "Seleccion Gigante" label in California between 1996 and 1997. The district court noted that whether these activities amounted to "use" within the meaning of California Business & Profession Code § 14209[38] was a

---

**38.** Section § 14209 provides:

[A] trademark shall be deemed to be "used" in this state (a) on goods when it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto

"close[ ] call." *Grupo Gigante*, 119 F.Supp.2d at 1103. The evidence before the court suggested that Grupo Gigante most likely believed that it was using the Gigante mark in California by virtue of its promotional activities directed at Californians. *Id.*[39]

There are no cases construing the California statute that governs state trademark and service mark cancellation. Analogous federal cases suggest that a misstated date of first use is not fraudulent so long as the first use of the mark has preceded the date of the application. *Pony Express Courier Corp. of Am. v. Pony Express Delivery Serv.*, 872 F.2d 317, 319 (9th Cir.1989). Here, before the June 1998 filing date, Grupo Gigante had engaged in extensive promotion of its mark and limited distribution of products under the Gigante name. Nothing in the record shows that Grupo Gigante improperly recorded the date of first use of the Gigante mark with an intent to deceive. With no evidence of fraud and evidence of significant activity in California that preceded the filing date of Grupo Gigante's trademark and service mark registrations, the district court properly denied the Dallos' motion for summary judgment on this issue.[40]

## VACATED AND REMANDED.

and such goods are sold or otherwise distributed in the state, and (b) on services when it is used or displayed in the sale or advertising of services and the services are rendered in this state.

**39.** The Fourth Circuit recently held that use of a trademark in connection with the sale of goods or services anywhere in the world, coupled with domestic promotion of that use, suffices to establish priority under the Lanham Act. *Int'l Bancorp*, 329 F.3d at 373. *International Bancorp's* interpretation of the Lanham Act has been called into question. *See McCarthy* § 29:4, at 29–14. Nonetheless,

GRABER, Circuit Judge, concurring:

I concur in the majority's opinion because I agree that a foreign owner of a supposedly famous or well-known foreign trademark must show a higher level of "fame" or recognition than that required to establish secondary meaning. Ultimately, the standard for famous or well-known marks is an intermediate one. To enjoy extraterritorial trademark protection, the owner of a foreign trademark need not show the level of recognition necessary to receive nation-wide protection against trademark dilution. On the other hand, the foreign trademark owner who does not use a mark in the United States must show more than the level of recognition that is necessary in a domestic trademark infringement case.

Nonetheless, I write separately to express my view that the evidence that Plaintiffs have presented thus far is insufficient as a matter of law to establish that their mark is famous or well-known. The survey population and the survey's results establish little more than the fact that Plaintiffs' customers are familiar with Plaintiffs' stores. In an abundance of caution, the majority does not intimate whether that evidence is sufficient to warrant a grant of summary judgment in Plaintiffs' favor on the issue of the famous mark exception. I would go beyond intimation and hold directly that Plaintiffs' evidence

the case demonstrates that Grupo Gigante was not alone in thinking that, in certain circumstances, advertising and promotion may constitute use of a trademark.

**40.** Ultimately, very little turns on the cancellation-of-registration claim because registration is not necessary to establish trademark protection under federal or California law. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 n. 3 (9th Cir.2000); *Kelley Blue Book v. Car–Smarts, Inc.*, 802 F.Supp. 278, 289–90 (C.D.Cal.1992).

is insufficient to support a grant of summary judgment in its favor. I would further hold that, unless the district court entertains a renewed motion for summary judgment on a considerably expanded record, this case should proceed to trial.

The district court, relying entirely on survey evidence, concluded that Plaintiffs' trademark had acquired secondary meaning and was thus entitled to protection from domestic users.[1] The survey population consisted of only 78 people in San Diego County who were "Spanish-speaking, and had recently purchased Mexican-style food at a supermarket or other food store." *Grupo Gigante S.A. de C.V. v. Dallo & Co., Inc.*, 119 F.Supp.2d 1083, 1093 (C.D.Cal.2000). Twenty-four respondents from that population "(1) had recently shopped at a Gigante store in Mexico; (2) believed that the Gigante name was affiliated with an entity that had at least one store located in Mexico; or (3) were aware of a Gigante supermarket located in Mexico." *Id.* However, the survey was conducted in 2000, nine years *after* Defendants first began using the Gigante name in the United States. When testing for awareness of the Gigante mark *before* Defendants' entry into the San Diego market in 1991, the awareness level dropped to 20 to 22 percent of the respondents. *Id.* That is, the district court based its conclusion that Plaintiffs' mark was well known on a survey that turned up just *seventeen people* who had heard of Gigante before 1991.

That evidence is insufficient in two important respects. First, the survey result is highly questionable in view of its narrowly defined survey population. Plaintiffs' own description of their stores makes clear that the goods sold are little different from those available in any large retail grocery store: "Product offerings in the Gigante stores generally include a complete selection of perishable and non-perishable foods and a wide selection of general merchandise, as well as clothing and fashion items." Further, Plaintiffs admit in their briefs that the clientele of their Mexican stores includes "both Hispanic and non-Hispanic" customers. Consequently, nothing about *either* the nature of the goods sold by Plaintiffs *or* its customer base warrants limiting the relevant public to Mexican–Americans.

We have rejected similar attempts to limit the relevant sector of the public. For instance, in *Japan Telecom, Inc. v. Japan Telecom America Inc.*, 287 F.3d 866, 875 (9th Cir.2002), a trademark dispute between two providers of telecommunications services, the plaintiff advertised only to "members of the Japanese and Japanese American business communities in Southern California." Nonetheless, we concluded that "the relevant buying public consists at least of buyers of telephone and network installation services in that region." *Id.* Thus, we emphasized *the nature of the service provided*, rather than the composition of the market to which the plaintiff actively targeted its services.

Because Plaintiffs sell widely-available, non-specialized goods to the general public, it is uninformative to focus exclusively on Mexican–Americans living in San Diego County. The district court's reliance on Plaintiffs' survey is especially problematic because its population was limited to Mexican–Americans who had recently purchased Mexican-style food at a supermar-

---

1. Expert surveys can provide the most persuasive evidence of secondary meaning. *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822 (9th Cir.1996). "However, survey data is not a requirement and secondary meaning can be, and often is, proven by circumstantial evidence." 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 32:190, at 32–319 to 32–320 (4th ed.2002).

ket or grocery store. That survey is only very slightly more informative than the study whose probative value we dismissed entirely in *Avery Dennison Corp. v. Sumpton,* 189 F.3d 868 (9th Cir.1999), because it focused exclusively on the plaintiff's existing customers: "Avery Dennison's marketing reports are comparable to a survey we discussed in *Anti–Monopoly, Inc. v. General Mills Fun Group, Inc.,* 684 F.2d 1316 (9th Cir.1982), proving only the near tautology that consumers already acquainted with Avery and Avery Dennison products are familiar with Avery Dennison." 189 F.3d at 879.

Because a conclusion that Plaintiffs have a protectable interest would prohibit Defendants from selling groceries under that mark to *any* residents of San Diego County—not just to Mexican–Americans—it makes little sense to define the relevant public so narrowly. Comprised of all grocery shoppers, the "relevant sector of the public" in this case is the very antithesis of a specialized market; because everyone eats, the relevant sector of the public consists of all residents of San Diego County, without qualification.

Second, in view of the standard we announce today, I do not believe that a showing that 20 to 22 percent of the relevant market is familiar with the foreign mark establishes that a "significant" or "substantial" percentage of that market is familiar with the foreign mark. On that ground alone, I would conclude that Plaintiffs have failed, so far, to show that their mark is famous or well-known.

In terms of the level of fame, trademark dilution cases often speak of a "significant percentage of the defendant's market." *Mead Data Cent., Inc. v. Toyota Motor*

*Sales, U.S.A., Inc.,* 875 F.2d 1026, 1031 (2d Cir.1989). Discussing the level of recognition required to establish "niche fame," McCarthy argues that "a mark should not be categorized as 'famous' unless it is known to more than 50 percent of the defendant's potential customers." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 24:112, at 24–271 (4th ed.2002).

I would adopt a similar standard for the exception for famous or well-known foreign marks. When a foreign mark has not been used in the United States, I would require the owner of the foreign mark to show, through surveys and other evidence, that a majority of the defendant's customers and potential customers, on aggregate, were familiar with the foreign mark when the defendant began its allegedly infringing use. Admittedly, that is a high standard. However, I believe that a stringent standard is required when conferring trademark protection to a mark that has never been, and perhaps never may be, used in this country. A conclusion that Plaintiffs' mark is well-known in the relevant sector brings with it the right to oust Defendants from their own market, notwithstanding the fact that they have established priority of use. A bare showing of acquired distinctiveness should not suffice to invert the ordinary allocation of trademark rights.

Of course, I recognize that the doctrine of "niche fame" has received heavy, and in the context of *domestic* trademark law, deserved criticism. However, the niche fame cases may provide the district court with an instructive benchmark against which to measure an intermediate standard of fame.[2]

---

**2.** There are no other cases that directly guide us here. Although international trademark law has recognized both the territoriality

principle and the exception for famous and well-known marks since 1925, remarkably, no case addressed meaningfully the exception be-

In summary, I agree with the majority's conclusion that this case must be remanded and the evidence reevaluated under a heightened standard for the famous or well-known marks exception. However, I would hold directly that the evidence presented thus far does not meet that standard and thus does not suffice to warrant protection for Plaintiff's mark. Finally, in determining whether a foreign mark has met the standard for famous or well-known foreign trademarks, I would look to precedent from this court and others addressing whether a mark has become famous in its market niche.

fore the district court's decision below. Since that decision, only one case has confronted the issue. *Empresa Cubana del Tabaca v. Culbro Corp.*, 70 U.S.P.Q.2d 1650, 2004 WL 602295 (S.D.N.Y.2004). *Empresa Cubana* adhered closely to the reasoning and conclusion of the district court in this case. *Id.* at 1676–77.